[No. 24517–1–I.   Division One.   January 28, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT
WALLACE PARKER, *Appellant*.

■

■

*Patrick Long* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Linda Jacke, Deputy,* for respondent.

PEKELIS, J.—Robert W. Parker appeals from his conviction on one count each of vehicular homicide and vehicular assault. Parker was charged after a car he was racing against collided with an oncoming vehicle, killing one person and seriously injuring another. He contends that there is insufficient evidence to (1) establish his liability as an accomplice, and (2) prove that his racing proximately caused the accident.

I

On the night of September 2, 1988, Parker's fiancee, Cherie Marie Keese, went roller skating with a friend, Stephanie Whitacre, at Skate King in Bellevue. Parker was also out that evening with a friend, Eric Lewis. The two had parked across from Skate King in Parker's red Pontiac Firebird. According to Lewis, Parker wanted to see if Keese was "out screwing around."

Keese and Whitacre skated until approximately 11 p.m., when Skate King closed. They left in Keese's Ford Mustang. Parker and Lewis, however, did not see Keese exit the parking lot because they had left to make a telephone call. When they discovered that Keese's car was gone, they drove by her home and Whitacre's home, but were unable to find them. Eventually, Parker decided to drive Lewis home.

On their way, Parker passed Keese traveling in the opposite direction. She was returning from Parker's home.

Both drivers turned their cars around and proceeded to drive past each other again.

After missing each other several times, Keese decided to go home. She pulled into a gas station to turn around when she saw Parker heading toward the southbound entrance to Interstate 405 (I–405). When Parker entered the freeway, Keese followed him. She testified that she was about 20 to 25 car lengths behind him.[1] She flashed her lights several times to get his attention and sped up quickly to catch him.

Parker knew that Keese was trying to catch up. When Lewis told him that she was behind them flashing her lights, he stated that she was going to have to follow them to Bellevue because he was not going to pull over. Keese increased her speed to catch up with him. Parker responded by also speeding up. He later stated that he was "trying to lose her." Lewis, who was frightened by Parker's driving, covered his eyes and asked Parker to slow down. Whitacre also told Keese to slow down.

Approximately 4.5 miles from where they first entered I–405, the cars approached a Ford LTD driving in the center lane, directly in front of Keese. Parker was on the Ford's right, in the adjacent lane. Keese attempted to pass the Ford but as she changed from the center to the far left lane she lost control of her car. She "fishtailed" several times and went careening through the median and into the northbound lanes of traffic where she crashed into a Toyota Celica. Parker's car was not physically involved in the collision. After seeing Keese cross the median, he pulled off to the side of the freeway and returned to the accident site.

Whitacre was killed. The driver of the Toyota Celica, Suenie Humble, suffered massive head trauma and is permanently disabled. On November 4, 1988, Parker and Keese were charged by information with one count each of

---

[1]At trial, Lewis placed Keese's car ¼ mile behind Parker's car as they entered the freeway. However, he later lowered this estimate to 6 to 7 car lengths to conform with an earlier statement he had given to a state patrol officer.

vehicular homicide, RCW 46.61.520, and vehicular assault, RCW 46.61.522. They were tried together.

At trial, the State argued that Parker was criminally liable under one of two alternative theories: First, that he was liable as an accomplice because he had encouraged Keese's reckless driving. Second, that Parker was liable as a principal because his own reckless driving proximately caused the accident.

There were several eyewitnesses who testified about the accident. Keese herself stated that she did not exceed 70 miles per hour. She noted that her car shakes at any speed over 70 m.p.h. and it did not shake that night.

Lewis, Parker's passenger, gave conflicting estimates of Parker's speed. He initially testified that Parker never drove faster than 70 m.p.h. He later acknowledged telling a state patrol officer that the speed may have been 75 m.p.h. or more. Finally, there was evidence that immediately after the accident, Lewis ran to a car which had stopped on a road paralleling I–405. He told the driver, an off–duty Bellevue police officer, that Parker was "doing approximately 110 miles per hour and trying to dust [Keese] off".

A motorcyclist who was riding in the far left lane testified that he was traveling at 75 m.p.h. when Parker and Keese, traveling side by side, "flew" by him as if he was "standing still." In his opinion, the two cars were traveling between 90 and 100 m.p.h.

The driver of the Ford LTD testified that she was travelling at approximately 60 m.p.h. She believes that Keese must have been driving 80 m.p.h. Another witness testified that two cars passed him "at the same time at a high rate of speed." He estimates that they were driving at a minimum of 90 m.p.h. and looked like they were racing.

In addition to the eyewitness testimony, three expert witnesses testified at trial. The State's accident reconstruction expert determined that Keese was traveling at least 85.3 m.p.h. before losing control of her vehicle, but that a speed of up to 100 m.p.h. was reasonable. In his opinion, a

car traveling "normal freeway speed" would have been incapable of continuing across the median once entering it.

The reconstruction expert was unable to calculate the exact speed of Parker's car because of a lack of physical evidence. However, working backward from the location of Parker's parked car, he calculated that if Parker had been traveling 85 m.p.h. and had seen the accident occur, he would have stopped at that point in the road where he, in fact, had pulled off.

Another expert testified about the structural damage sustained by the Mustang. As a result of the accident, the engine and transmission became completely disengaged from the car. The expert testified that in his 22½ years on the force, this was only the second time that he had seen such an occurrence. In his opinion, the separation was "most likely" related to Keese's high speed.

Further examination also revealed a broken tie rod on the Mustang's right front end. Both experts determined that the tie rod could not have broken before the accident because the car would have veered to the right, not the left.

Finally, Keese's own expert witness placed her speed just before the impact at approximately 85 m.p.h. He testified that this was a conservative estimate of the car's speed and that Keese could have been going 90 m.p.h. He also testified that if both Parker and Keese had entered the freeway at almost the same time, and several miles later were seen side by side, the logical conclusion was that Parker's car was traveling at least as fast as Keese's car. Finally, he agreed with the State's experts that the broken tie rod probably did not cause the accident.

At the close of the State's case, Parker moved to dismiss the charges against him, arguing that the evidence failed to establish his liability as an accomplice. The motion was denied. Parker also took exception to the court's instructions on accomplice liability.

On May 17, 1989, a jury found both Parker and Keese guilty as charged. Parker appeals his conviction.

## II

Parker contends that there was insufficient evidence to submit the issue of accomplice liability to the jury because the State failed to prove that he intentionally encouraged Keese to commit vehicular homicide or assault.

█ In reviewing a challenge to the sufficiency of the evidence, we must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)).

Under an accomplice liability theory, the State was required to prove that the defendant, with knowledge that it will promote a crime, (1) encouraged another to perform an act of reckless driving which (2) proximately caused death or serious bodily injury.[2]

█ Addressing the first requirement, our courts have held that presence alone plus knowledge of ongoing activity does not establish the intent requisite to a finding of accomplice liability. *In re Wilson*, 91 Wn.2d 487, 492, 588 P.2d 1161 (1979) (no complicity where defendant was

---

[2]RCW 9A.08.020 provides in part:

"(3) A person is an accomplice of another person in the commission of a crime if:

"(a) With knowledge that it will promote or facilitate the commission of the crime, he

"(i) solicits, commands, encourages, or requests such other person to commit it; or

"(ii) aids or agrees to aid such other person in planning or committing it; . . .".

RCW 46.61.520 provides in part:

"(1) When the death of any person ensues within three years as a proximate result of injury proximately caused . . . by the operation of any vehicle in a reckless manner . . ., the person so operating such vehicle is guilty of vehicular homicide."

RCW 46.61.522 provides in part:

"(1) A person is guilty of vehicular assault if he operates or drives any vehicle:

"(a) In a reckless manner, and this conduct is the proximate cause of serious bodily injury to another; . . .".

present but did not participate in pulling rope across highway as cars approached). Rather, an accomplice must be associated "with the venture and participate in it as something he wishes to bring about and by his action make it succeed." *State v. Jennings,* 35 Wn. App. 216, 220, 666 P.2d 381, *review denied,* 100 Wn.2d 1024 (1983).

Here, Parker's contribution to the accident is that of an active participant, not a mere bystander. The evidence reflects that he knew Keese was behind him and that her only purpose in being on the freeway was to make contact with him. Moreover, when she increased her speed to catch up, he also sped up in an effort to "lose her". In a statement given after the accident, Lewis compared their conduct to a game of "cat and mouse" in which "one [was] trying to get away from the other". Keese herself testified that she would have slowed down if Parker had decreased his speed. The inference from the evidence is that Parker was aware of this fact. Finally, at least one of the lay witnesses observed that the cars driven by Parker and Keese looked like they were racing.

Parker's reliance on *State v. Cordero,* 36 Wn.2d 846, 221 P.2d 472 (1950) is misplaced. In *Cordero,* the court held that there was insufficient evidence to find the defendant guilty as an accomplice to negligent homicide. *Cordero* had allowed another to drive his car with the knowledge that she had been drinking. The court found that this evidence did not support the conclusion that he knew an appreciable time before the accident that she was driving in a reckless manner or under the influence of alcohol. *Cordero,* 36 Wn.2d at 851.

Unlike the situation in *Cordero,* however, Parker not only knew that Keese was driving in a reckless manner, he knew that his attempt to speed away over a distance of 4.5 miles encouraged her reckless driving. Accordingly, we conclude that the evidence is sufficient to sustain a finding that Parker promoted Keese's reckless driving.

In addition to encouragement, the State was also required to prove causation. Proximate cause is a cause

which in direct sequence, unbroken by any new, independent cause, produces the event complained of and without which the injury would not have happened. *State v. Gantt*, 38 Wn. App. 357, 359, 684 P.2d 1385 (1984) (citing *Bernethy v. Walt Failor's, Inc.*, 97 Wn.2d 929, 935, 653 P.2d 280 (1982)).

There was ample evidence here to sustain a finding that Keese's reckless driving, specifically her excessive speed, was a proximate cause in the death of Whitacre and injury to Humble. At trial, the expert witnesses addressed two possible causes of the accident: speed and a broken tie rod.[3] They were unanimous in their opinions that the accident was not caused by a broken tie rod. They also agreed that the magnitude of the crash and the inability to avoid it were at least in part due to Keese's high speed.

■■ Parker appears to contend that the State is also required to separately establish that *his* driving was a proximate cause of the accident. We disagree. As an accomplice, Parker is charged with, and legally accountable for, the particular crime committed by his principal. RCW 9A.08.020(1). Here, his criminal liability is established by the fact that he encouraged Keese to drive recklessly, and that her recklessness caused the accident and resulting death and injury.

Nonetheless, we are also convinced that the evidence does support a finding that Parker's high speed was a proximate cause of the accident even though his car was not physically involved. There may be more than one proximate cause of a death or injury. *See State v. Neher*, 112

---

[3]Other possible causes were brought up at trial. State Trooper Kathryn Reasor testified that shortly after the accident she examined the southbound lanes and found no evidence of a pothole or debris which could have caused the accident.

In addition, Keese, at one point in the trial, claimed that Whitacre was out of her seat belt and grabbed the steering wheel. However, this theory was contradicted by the fact that Whitacre was found strapped into her seat when the car came to rest.

Wn.2d 347, 352, 771 P.2d 330 (1989) (involving the vehicular assault statute) (citing *State v. Jacobsen,* 74 Wn.2d 36, 37, 442 P.2d 629 (1968) (involving the negligent homicide statute, the predecessor to the current vehicular homicide statute)). Parker's excessive speed was a proximate cause of Keese's speeding which in turn was a proximate cause of the death and injury.

Finally, Parker points to the fact that, here, the State's accident reconstruction expert failed to link his racing to Keese's accident. He argues that *State v. Escobar,* 30 Wn. App. 131, 633 P.2d 100 (1981) requires such testimony. We disagree.

In *Escobar,* the driver of one of two vehicles racing on a public highway was killed in a head–on collision while crossing a bridge. The accident reconstruction expert indicated that because of the parties' excessive speeds, the surviving driver's rapid acceleration on the decedent's right, cutting off escape, and the split–second reaction times involved at those speeds, a collision was inevitable the moment the decedent began to pass. Based on this evidence, the court held that the surviving driver was a proximate cause of the collision and the ensuing death. *Escobar,* 30 Wn. App. at 139.

However, *Escobar* does not mandate expert testimony as Parker contends, and it clearly is not required here. The evidence plainly establishes that Parker and Keese *both* participated in a "cat and mouse" game which directly resulted in the fatal collision.[4] The language of RCW 46.61.520 and RCW 46.61.522 is broad enough to impose criminal liability against Parker under these circumstances.

---

[4]The State argues that the facts here are essentially equivalent to those in *Escobar* because the evidence is that when Keese approached the rear of the Ford LTD from the center lane, the Ford's escape to the right was blocked by Parker's vehicle. Thus, Keese had to swerve left, at which point she lost control of her vehicle. The evidence, however, is not as strong as the State suggests. Although the driver of the Ford testified to having "felt" the presence of a car on her right, she admitted that she did not actually know that a car was there.

In sum, there is sufficient evidence to enable the trier of fact to find that Parker's speeding away from Keese encouraged her reckless driving, and that this satisfied the State's burden of establishing proximate causation. Accordingly, we affirm.

BAKER, J., and BRITT, J. Pro Tem., concur.

Review denied at 116 Wn.2d 1025 (1991).