**FILED**
**JUNE 28, 2018**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34768-1-III |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LASHAWN DOUXSHAE JAMEISON, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent, | ) | |
| | ) | |
| KWAME DAVON BATES | ) | |
| ANTHONY GILBERT WILLIAMS | ) | |
| | ) | |
| Defendants. | ) | |

FEARING, J. — We address intriguing questions worthy of a criminal law class examination, but which carry monumental consequences to the accused Lashawn Jameison. This appeal primarily asks whether an accused, who, in response to an antagonist retrieving a gun, also arms himself and hides behind a vehicle, suffers accomplice liability for homicide when, without the accused shooting his firearm, the antagonist fires his gun and the bullet strikes and kills an innocent bystander. The State argues that the accused bears liability because he encouraged his adversary to fire the gun. The State emphasizes that Lashawn Jameison later exchanged gunfire.

The appeal also asks whether the same accused may be convicted of a drive-by shooting when he retrieves a gun from the car in which he arrived to the scene of the homicide but crouches behind another car at the time he returns fire. We affirm the trial court's summary dismissal of the homicide charges and twelve of fourteen of the drive-by shooting charges. We affirm the dismissal of the drive-by shooting charges based on our decision in *State v. Vasquez*, 2 Wn. App. 2d 632, 415 P.3d 1205 (2018), decided after the trial court ruling.

FACTS

This prosecution arises from a confrontation between Kwame Bates and defendant Lashawn Jameison, on the one hand, and Anthony Williams, on the other hand, during which skirmish Williams fired his gun and killed bystander Eduardo Villagomez. A video partially captures the confrontation and shooting.

On the night of January 17-18, 2016, Lashawn Jameison and Kwame Bates joined a group of five hundred young adults at the Palomino Club in Spokane to celebrate Martin Luther King Day. Bates drove Jameison to the club in a white Toyota Camry owned by Bates' girlfriend, which car gains significance as events transpire. Bates parked the Camry on Lidgerwood Street in front of a Department of Licensing building adjacent to the club. A Chrysler parked behind the Camry on the street. We do not know the time of night that Bates and Jameison arrived at the celebration.

The Palomino Club closed at 2 a.m. on January 18. As Lashawn Jameison and

2

Kwame Bates exited the club at closing, another patron, Anthony Williams, shoved Sierra, a female friend of Bates. The shove began a deadly chain of events. As a result of the push, Bates and Williams argued. Jameison did not participate in the quarrel. Williams jumped a metal fence bordering the club parking lot, retrieved a handgun from a car parked in the adjacent Department of Licensing parking lot, and returned to the entrance of the club. Williams paced to and from the club building, the adjacent lot, and Lidgerwood Street.

Both Kwame Bates and Lashawn Jameison, knowing that Anthony Williams possessed a firearm, returned to the white Toyota Camry and armed themselves. Both Bates and Jameison lawfully owned firearms. During this activity, other patrons of the Palomino Club departed the building and walked to their cars parked in the club parking lot, in the adjacent parking lot, and on the street.

Lashawn Jameison, with gun in hand, retreated and separated himself from Kwame Bates and Anthony Williams. Jameison hid at the rear of the Chrysler parked behind the Camry while Bates stood by a power pole near the Camry. Bates and Williams, with Williams then in the Department of Licensing parking lot, faced one another as Martin Luther King Day celebrants continued to walk to their cars. According to Bates, he "does not back down" from a fight as long as the fight is fair. Clerk's Papers (CP) at 158. Jameison crouched behind the Chrysler.

3



A friend of Anthony Williams drove the friend's car into the parking lot. Williams stepped behind his friend's vehicle and discharged his gun in Bates' direction. The bullet missed Bates and struck Eduardo Villagomez, a bystander walking along the street. Villagomez slumped to the street. Tragically an unsuspecting driver of a car drove over Villagomez's stricken body. Villagomez died as a result of the bullet wound and the force of the vehicle.

After Anthony Williams' discharge of gunfire, Kwame Bates ran from the power pole and joined Lashawn Jameison behind the stationary Chrysler. Seconds after Williams fired the first shot, Bates and Jameison stood, returned fire, and crouched again behind the Chrysler. Jameison fired, at most, two shots toward Williams. Williams returned additional shots toward Bates and Jameison. Bates rose again and returned fire

4

as Williams entered the vehicle driven by his friend. The friend drove the vehicle from

the parking lot and club. Bates and Jameison entered the Camry and also departed the

neighborhood.

Because the State contends inferences from the facts support accomplice liability,

we now repeat and quote evidence in its unedited form and as presented to the trial court.

Spokane Police Department Detective Marty Hill reviewed a security video, and, based

on this viewing, wrote in an amended statement of investigating officer:

> This individual is a black male dressed in a bright red top (later
> identified as Lashawn D. Jameison, BM, 04/18/1994). . . . Jameison
> appears to be crouching down behind the Chrysler 300 as if hiding prior to
> being joined by Bates.

CP at 8. Detective Hill added:

> A sedan, later found to be driven by Jazzmine Dunlap, pulls into the
> lot[,] and a male approaches the driver rear door. This male, later identified
> as Anthony G. Williams, B/M, 08/18/1993, then begins to fire shots at
> Jameison and Bates who are secreted behind the Chrysler 300. The victim,
> later identified as Eduardo Villagomez, HM, 01/15/1995, and his three
> companions, later identified as Carlos Villagomez, Miguel L. Martinez, and
> Rosario A. Ayala, are on Lidgerwood St. to the north and directly in the
> line of fire, but not involved in this gunfire. *Williams appears to be
> engaging Bates. Williams appears to fire first at Bates*, who then retreats to
> the Chrysler 300 where Jameison had secreted himself. Jameison and Bates
> are observed shooting south towards Williams, exchanging gunfire.

CP at 9 (emphasis added) (boldface omitted).

In his amended statement of investigating officer, Detective Marty Miller shares

the story as told by Kwame Bates during an interview by Miller:

5

As he [Bates] approached his car, the white 1993 Toyota Camry . . . , he did see L-Jay [Lashawn Jameison] behind the Chrysler 300. Bates put himself standing in the street to the east of his car. Bates said the male with the gray sweatshirt [Anthony Williams] approached him from the parking lot of the DMV [Department of Motor Vehicles] building. Bates stated this male was yelling at him and he thought he and this unknown male were going to have a fair fight. Bates stated he does not back down from fights as long as they are fair.

Bates stated this unknown male pulled out his firearm. Bates said he ran to his right and jumped behind the Chrysler 300 as the male began shooting. Bates said he could hear bullets striking the Chrysler. Bates admitted that he returned fire towards this male as the male was running towards a gray colored car. Bates indicated that he fired between six and seven shots. Bates said when the male entered the car, he did not continue to shoot anymore, but he and L-Jay jumped into the white 1993 Toyota Camry . . . and they drove away.

Bates said it happened so fast, "I thought it was over for me."

CP at 12.

Stephanie Collins, a deputy prosecuting attorney, signed a statement outlining facts in chronological order. Collins declared in part:

11. A Chevy Cruze pulls into the DOL [Department of Licensing] lot—later determined to be driven by a friend of Williams', Jazzmine Dunlap. The car stops in the DOL lot and Williams approaches it. Williams faces Lidgerwood and is walking back and forth along the driver's side of the car;

12. *Williams and Bates square off.* They are approximately 30-60 feet apart. Bates is facing Williams in the DOL lot. Williams is facing Bates, whose [sic] is on Lidgerwood.

CP at 133-34 (emphasis added).

PROCEDURE

The State of Washington charged Lashawn Jameison with first degree murder by

6

extreme indifference and, in the alternative, first degree manslaughter as the result of the death of Eduardo Villagomez. The State acknowledged that Anthony Williams shot Eduardo Villagomez but charged Jameison with accomplice liability. The State also charged Jameison with fourteen counts of drive-by shooting as a result of Jameison's returning of gunfire. The fourteen charges arise from the presence of at least fourteen club patrons in the vicinity at the time of the shooting.

Lashawn Jameison moved to dismiss the homicide charges pursuant to *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986). Jameison emphasized that the video of the scene and law enforcement officers' reports and affidavits demonstrated beyond dispute that Anthony Williams killed the decedent while Jameison ducked behind a car, shielding himself from Williams' attack. Jameison added that, because he had not fired a shot by the time Williams' bullet struck Eduardo Villagomez and because he himself was a victim of Williams' violence, he could not be guilty of murder even as an accomplice. Jameison posited the same arguments for the alternative charge of manslaughter.

Lashawn Jameison also moved to dismiss the drive-by shooting charges for insufficient evidence of recklessness. In the alternative, he argued that all but one count should be dismissed because he fired only one shot. He based the latter argument on law enforcement's discovering, at the crime scene, only one shell casing matching his gun.

As part of its response to Lashawn Jameison's motion to dismiss, the State filed a certificate of Deputy Prosecuting Attorney Stefanie W. Collins, which outlines the facts

7

in serial and chronological form.  We previously quoted two paragraphs from the

certificate.  Collins declared that she based the facts on her review of police reports and

security video.  In reply, Jameison asked that Collins' certificate be stricken because

Collins did not base her certificate on percipient knowledge.  The trial court's order of

dismissal does not indicate whether the court granted the motion to strike.

The trial court dismissed the first degree murder and first degree manslaughter

charges on the basis, in part, that Lashawn Jameison did not cause the death of Eduardo

Villagomez.  The trial court also ruled that the unit of prosecution for drive-by shooting

charges was the number of shots fired by Jameison.  Because of a dispute of fact as to

whether Jameison fired one or two shots, the trial court dismissed all but two of the

fourteen drive-by shooting counts.

The State requested and this court granted discretionary review of the trial court's

dismissal of some of the pending charges.  After we accepted discretionary review, this

court decided *State v. Vasquez*, 2 Wn. App. 2d 632 (2018), which delineates the elements

of a drive-by shooting prosecution.  We requested that both parties address *Vasquez*

during oral argument.

## LAW AND ANALYSIS

### Facts and Inferences

The State appeals dismissal of the murder, manslaughter, and the twelve drive-by

shooting charges.  Lashawn Jameison has not sought review of the trial court's refusal to

dismiss the remaining two drive-by shooting counts. Before addressing the substantive law of homicide and drive-by shootings, we first determine what facts to apply to the law. The parties contest what constitutes the unquestioned facts and the permissible inferences from those facts. We must resolve this dispute of undisputed facts.

CrR 8.3(c) permits an accused to seek dismissal of charges before trial. The rule declares:

> On Motion of Defendant for Pretrial Dismissal. The defendant may, prior to trial, move to dismiss a criminal charge due to insufficient evidence establishing a prima facie case of the crime charged.
> (1) The defendant's motion shall be in writing and supported by an affidavit or declaration alleging that there are no material disputed facts and setting out the agreed facts, or by a stipulation to facts by both parties. The stipulation, affidavit or declaration may attach and incorporate police reports, witness statements or other material to be considered by the court when deciding the motion to dismiss. . . .
> (2) The prosecuting attorney may submit affidavits or declarations in opposition to defendant's supporting affidavits or declarations. The affidavits or declarations may attach and incorporate police reports, witness statements or other material to be considered by the court when deciding defendant's motion to dismiss. . . .
> (3) The court shall grant the motion if there are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt. In determining defendant's motion, the court shall view all evidence in the light most favorable to the prosecuting attorney and *the court shall make all reasonable inferences in the light most favorable to the prosecuting attorney.* The court may not weigh conflicting statements and base its decision on the statement it finds the most credible. . . .
> (4) If the defendant's motion to dismiss is granted, the court shall enter a written order setting forth the evidence relied upon and conclusions of law. The granting of defendant's motion to dismiss shall be without prejudice.

(Emphasis added) (boldface omitted).

The order in response to Lashawn Jameison's motion to dismiss does not list the affidavits, declaration, or reports reviewed by the trial court. Therefore, we have scoured all evidence forwarded to this appellate court. We included in our review the certificate of Stephanie Collins, to which Jameison objected, without determining the propriety of its use. Jameison's trial court entered findings of fact, but we conclude we must determine the facts on our own since the trial court does not resolve disputed facts on a motion to dismiss.

Trial courts should grant an accused's motion to dismiss when the undisputed facts do not establish a prima facie case of guilt. CrR 8.3(c)(3). The law labels such motions to dismiss as *Knapstad* motions in reference to a leading Washington decision, *State v. Knapstad*, 107 Wn.2d 346 (1986). The Supreme Court adopted CrR 8.3(c)(3) in light of its *Knapstad* decision. A *Knapstad* motion in a criminal case corresponds to a summary judgment motion in a civil case.

We review de novo a trial court's decision to grant a *Knapstad* motion and to dismiss a criminal prosecution under CrR 8.3(c). *State v. Bauer*, 180 Wn.2d 929, 935, 329 P.3d 67 (2014). During review, as demanded by the criminal rule, this court views the facts and all reasonable inferences in the light most favorable to the State. *State v. O'Meara*, 143 Wn. App. 638, 642, 180 P.3d 196 (2008). An appellate court will uphold the trial court's dismissal of a charge if no rational trier of fact could have found beyond

a reasonable doubt the essential elements of the crime. *State v. Snedden*, 112 Wn. App. 122, 127, 47 P.3d 184 (2002), *aff'd*, 149 Wn.2d 914, 73 P.3d 995 (2003).

On discretionary review, the State of Washington writes that Lashawn Jameison's act of arming himself and "squaring off" with Anthony Williams encouraged Williams to fire his gun, which ultimately caused the death of Eduardo Villagomez. We agree the record shows that Jameison armed himself. We disagree with the State's assertion that Jameison "squared off" with Williams. The record of evidence repeatedly states that Anthony Williams and Kwame Bates "squared off." The record also indicates that Williams shot toward Jameison in addition to Bates. Nevertheless, whereas Jameison armed himself, no police report or other record claims that Jameison "squared off" with Williams. He instead crouched behind a car. Assuming Jameison "squared off" with Williams, the "squaring off" occurred after Williams fired the fatal shot.

The State additionally writes that Lashawn Jameison assumed a fighting position. We also disagree with this factual assertion. The only testimony about Jameison's physical stance concerns his crouching as if hiding behind a car because of Anthony Williams' brandishing a weapon. The video confirms this testimony.

The State repeatedly refers, in its briefing, to an agreement between Lashawn Jameison and Anthony Williams to fight. The record lacks any entry of an agreement between Jameison and Williams to fight, let alone an agreement between Kwame Bates and Williams to fight. The State concedes the record does not authenticate that Jameison

11

overtly agreed to fight. The State contends, however, that Jameison's actions in taking up arms and assuming a fighting position near Bates manifested Jameison's agreement to resolve differences by violence. In this regard, the State faults the trial court for failing to draw all reasonable inferences from the facts in favor of the State. We would be more likely to reverse the trial court's dismissal of homicide charges if facts supported such a rational inference of an agreement to which Jameison was a party.

We struggle in the abstract with what assay to employ when adjudging what reasonable inferences we may deduce from established facts. Therefore, we first comb for definitions and synonyms for our key word "inference." Our state high court has defined an "inference" as a logical deduction or conclusion from an established fact. *Fannin v. Roe*, 62 Wn.2d 239, 242, 382 P.2d 264 (1963). *State v. Aten*, 130 Wn.2d 640, 658, 927 P.2d 210 (1996) refers to a "reasonable and logical" inference, again suggesting that a permissible inference must be logical. A foreign court wrote that a reasonable inference may be defined as a process of reasoning whereby, from facts admitted or established by the evidence or from common knowledge or experience, a trier of fact may reasonably conclude that a further fact is established. *Stambaugh v. Hayes*, 1940-NMSC-048, 44 N.M. 443, 103 P.2d 640, 645. 5 *West's Encyclopedia of American Law* 396 (2d ed. 2005) partly defines "inference" as:

> Inferences are deductions or conclusions that with reason and common sense lead the jury to draw from facts which have been established by the evidence in the case.

Based on these definitions, we must summon logic, common sense, and experience in surmising additional or circumstantial facts from already established or direct facts. We hope that our experience coincides with common sense and our common sense abides logic.

Washington case law further teaches that a verdict does not rest on speculation or conjecture when founded on reasonable inferences drawn from circumstantial facts. *State Farm Mutual Insurance Company v. Padilla*, 14 Wn. App. 337, 339-40, 540 P.2d 1395 (1975). This proposition conversely suggests that an inference is not reasonable if based on speculation or conjecture. This observation, however, only begs the question of what constitutes speculation and conjecture.

A court occasionally faces the question of whether the trier of fact may infer only those facts that necessarily or always follow from established circumstances, whether the trier of fact may deduce those facts likely to have occurred as a result of the underlying circumstances, or whether the trier of fact may even employ inferences that exist as one of many possible inferences. We conclude that any reasonable inference must likely, but not necessarily, follow from an underlying truth.

When evidence is equally consistent with two hypotheses, the evidence tends to prove neither. *Stambaugh v. Hayes*, 103 P.2d at 645 (1940). We will not infer a circumstance when no more than a possibility is shown. *Brucker v. Matsen*, 18 Wn.2d 375, 382, 139 P.2d 276 (1943). We are not justified in inferring, from mere possibilities,

13

the existence of facts. *Gardner v. Seymour*, 27 Wn.2d 802, 810-11, 180 P.2d 564 (1947). Some of the decisions we cite entail civil appeals, but the law should demand stricter controls on use of inferences in a criminal case.

We also conclude that, in determining whether we should draw an inference that Lashawn Jameison agreed to fight, we do not only rely on the facts that Jameison retrieved his weapon and hid behind a car. Some cases teach that, when drawing inferences, the trier of fact should not isolate discrete facts but instead only draw reasonable inferences after viewing the evidence as a whole. *State v. Sanchez*, 2017 MT 192, 388 Mont. 262, 399 P.3d 886, 890; *State v. Stull*, 403 N.J. Super. 501, 506, 959 A.2d 286 (App. Div. 2008).

A leading Washington criminal decision regarding reasonable inferences comes in the setting of the corpus delicti rule but should apply to *Knapstad* motions because the corpus delicti question involved the sufficiency of evidence based on reasonable inferences. In *State v. Aten*, 130 Wn.2d 640 (1996), the high court reviewed whether reasonable inferences from evidence, other than Vicki Aten's confession, supported a finding that a criminal act caused the death of an infant so that the corpus delicti rule did not bar introduction of the confession as evidence. On the night of January 30, Aten cared for a four-month-old child. She found the child dead the next morning. A physician, who performed an autopsy on the infant, concluded that the child died of sudden infant death syndrome (SIDS), a form of acute respiratory failure. He

14

acknowledged suffocation could cause acute respiratory failure. But he also testified he could not determine in an autopsy whether SIDS or suffocation caused the acute respiratory failure. The State argued that the evidence sufficed to prove the corpus delicti because one logical and reasonable inference from the evidence was that the infant died from suffocation by Aten, a criminal act.

The Supreme Court, in *State v. Aten*, noted that it had not previously addressed directly the issue whether the State establishes the corpus delicti when evidence independent of a defendant's statements is consistent with reasonable and logical inferences of both criminal agency and innocence. The court held that the State does not establish corpus delicti when independent evidence supports reasonable and logical inferences of both criminal agency and noncriminal cause. The circumstantial evidence proving the corpus delicti must be consistent with guilt and inconsistent with a hypothesis of innocence. Accordingly, since the independent evidence from the child's death supported a reasonable and logical inference or hypothesis of innocence, that is that the child died of SIDS, insufficient evidence established the corpus delicti.

Washington law, if not the federal constitution, demands that inferences in the criminal setting be based only on likelihood, not possibility. When an inference supports an element of the crime, due process requires the presumed fact to flow more likely than not from proof of the basic fact. *State v. Hanna*, 123 Wn.2d 704, 710, 871 P.2d 135 (1994). Whether an inference meets the appropriate standard must be determined on a

15

case-by-case basis in light of the particular evidence presented to the jury in each case. *State v. Hanna*, 123 Wn.2d at 712.

We conclude that we should not draw an inference that Lashawn Jameison agreed to fight with Anthony Williams. Merriam Webster's online dictionary lists "agree" as a transitive verb meaning "a : to concur in (something . . . ) b : to consent to a course of action." https://www.merriam-webster.com/dictionary/agree (last visited June 19, 2018). No evidence directly confirms that Jameison concurred in Williams shooting at Jameison's direction. Experience, common sense and logic easily depict Williams acting on his own without any consent from Jameison or Bates. The State in essence portrays Lashawn Jameison and Anthony Williams as agreeing to a duel. The totality of the undisputed facts, however, leads one to conclude that Jameison never consented to a duel. Jameison retrieved his firearm only after Williams grabbed his weapon and in order to defend himself. He could have, but never did, shoot at Williams before Williams first shot in his direction.

The State also writes that Lashawn Jameison encouraged Anthony Williams to fire his weapon. The State may ask this court to infer encouragement as a factual matter from the conduct of Jameison. We deem whether or not Jameison encouraged Williams to be more a legal question, since we must decide whether any encouragement occurred within the meaning of RCW 9A.08.020, the accomplice liability statute.

16

Homicide

We arrive at our discussion of the substantive law. The murder and manslaughter charges raise the same question so we merge the analysis of these two alternative charges. We must decide whether, under the undisputed facts, the State can sustain a conviction for either crime against Lashawn Jameison based on accomplice liability.

Before addressing accomplice liability, we review the murder and manslaughter statutes. RCW 9A.32.030 covers first degree murder by extreme indifference. The statute declares:

> (1) A person is guilty of murder in the first degree when:
> . . . .
> (b) Under circumstances manifesting an *extreme indifference to human life*, he or she engages in conduct which creates a grave risk of death to any person, and thereby *causes the death of a person*. . . .

(Emphasis added.) The mens rea of murder by extreme indifference is aggravated recklessness, which requires greater culpability than ordinary recklessness or more than mere disregard for the safety of others. *State v. Dunbar*, 117 Wn.2d 587, 594, 817 P.2d 1360 (1991).

Manslaughter in the first degree occurs when a person recklessly causes the death of another person. RCW 9A.32.060. The statute intones:

> (1) A person is guilty of manslaughter in the first degree when:
> (a) He or she *recklessly causes the death of another person*. . . .

(Emphasis added.) "Recklessly" means, for purposes of defining manslaughter, that a

17

person knew of and disregarded a substantial risk that a homicide may occur. *State v. Gamble*, 154 Wn.2d 457, 467, 114 P.3d 646 (2005). First degree manslaughter differs from first degree murder in that the former only requires mere recklessness, while the latter aggravated recklessness.

This appeal concerns more the nature of accomplice liability than the elements of murder or manslaughter. RCW 9A.08.020 imposes accomplice liability in the following circumstances:

> (1) A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable.
> (2) A person is legally accountable for the conduct of another person when:
> . . . .
> (c) He or she is an accomplice of such other person in the commission of the crime.
> (3) A person is an accomplice of another person in the commission of a crime if:
> (a) *With knowledge that it will promote or facilitate the commission of the crime*, he or she:
> (i) Solicits, commands, *encourages*, or requests such other person to commit it; or
> (ii) Aids or *agrees to aid* such other person in planning or committing it; or
> (b) His or her conduct is expressly declared by law to establish his or her complicity.
> . . . .
> (5) Unless otherwise provided by this title or by the law defining the crime, *a person is not an accomplice in a crime committed by another person if:*
> (a) *He or she is a victim of that crime*. . . .

(Emphasis added.) The State relies on the word "encourages" inserted in RCW

18

9A.08.020(3)(a)(i) in prosecuting Lashawn Jameison.

When we read the accomplice liability statute, RCW 9A.08.020, with the murder and manslaughter statutes, RCW 9A.32.030 and RCW 9A.32.060, this appeal raises numerous discrete questions. First, did Lashawn Jameison cause the death of Eduardo Villagomez? Second, may Lashawn Jameison be guilty of accomplice liability when the mens rea under the accomplice liability statute affords liability based on knowingly promoting a crime but the underlying crimes demand only a mens rea of recklessness? Stated differently, does Washington's accomplice liability statute permit convictions based on underlying crimes with a mental state less than knowledge? Third, did Lashawn Jameison know that his arming of himself and hiding behind a car would promote or facilitate the killing of someone? Fourth, did Lashawn Jameison encourage Anthony Williams to discharge Williams' first shot that killed Villagomez? Fifth, was Jameison a victim of the initial shot fired by Williams? Sixth and related to the fifth question, may an accused be the accomplice to a shooting when the shooter attempts to harm the accused or a companion of the accused with the deadly bullet?

On appeal, the parties ably devote pages to the question of whether one can be an accomplice to a crime with a mens rea of recklessness. The trial court based its dismissal on the lack of causation. We ignore these questions and render our decision on other grounds. We hold discretion to affirm on any grounds supported by the record. *State ex rel. Eikenberry v. Frodert*, 84 Wn. App. 20, 25, 924 P.2d 933 (1996). We address and

conflate the fourth, fifth, and six questions. We find that the conduct of Jameison in arming himself and hiding behind a car from the bullets of Anthony Williams ineptly fulfills the meaning of "encouragement" and his situation borders on victimhood. In turn, imposing criminal liability on Jameison conflicts with general principles of accomplice liability and disserves policies behind imposing accomplice liability. Numerous decisions support our conclusion.

According to the State, Jameison encouraged Anthony Williams' conduct by words or conduct, including taking up arms with his companion Kwame Bates, agreeing to fight, assuming a strategic fighting position, and squaring off with Williams. The State adds that Jameison colluded with Bates to engage in an extremely reckless gunfight that resulted in the unintended death of Eduardo Villagomez. According to the State, but for Jameison's conduct, Williams "may not" have been encouraged to fire his pistol. We have already concluded that the record fails to support inferences that Jameison agreed to a fight, assumed a strategic fighting position, or squared off with Williams. Therefore, we ask whether Jameison's retrieval of a weapon, walking to the Chrysler, and crouching behind the car "encouraged" the fatal criminal conduct of Anthony Williams within the meaning of RCW 9A.08.020(3)(a)(i).

Our key term is "encourages." RCW 9A.08.020 lacks a definition for this common word. Because of the word's familiarity, we should not need to ponder a dictionary definition, but we mention one for its limited assistance. A dictionary defines

"encourage" as:

> 1 a: to inspire with courage, spirit, or hope: HEARTEN
> - she was *encouraged* to continue by her early success
>    B: to attempt to persuade: URGE
> - they *encouraged* him to go back to school
> 2: to spur on: STIMULATE
> - warm weather *encourages* plant growth
> 3: to give help or patronage to: FOSTER
> - government grants designed to *encourage* conservation

https://www.merriam-webster.com/dictionary/encourage (last visited June 19, 2018).

The conduct of Lashawn Jameison awkwardly fits within the import of inspiring Anthony Williams for success, persuading Williams to shoot, spurring Williams to action, or patronizing Williams.

Under Washington case law, regardless of whether the State relies on the word "encourage" or the words "solicit" or "command" within RCW 9A.08.020(3)(a)(i), an accomplice must associate himself with the principal's criminal undertaking, participate in it as something he desires to bring about, and seek by his action to make it succeed. *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979); *State v. LaRue*, 74 Wn. App. 757, 762, 875 P.2d 701 (1994). Presence and knowledge alone are insufficient, absent evidence from which a readiness to assist or an intent to encourage could be inferred, to support a finding of accomplice liability. *In re Welfare of Wilson*, 91 Wn.2d at 491-92.

Lashawn Jameison never sought to assist Anthony Williams. He never directly encouraged Williams to shoot either himself or Kwame Bates. Williams wanted to shoot or wound Bates or Jameison. Jameison did not seek this goal. Jameison and Williams acted as antagonists. They entered any fight from opposite poles.

We review two cases on which the State relies and another decision and then compare the three decisions with other decisions. In *In re Personal Restraint of Sandoval*, 189 Wn.2d 811, 408 P.3d 675 (2018), the high court affirmed accomplice liability for murder when Eduardo Sandoval helped plan a retaliatory attack against a rival gang and participated in the homicidal attack as a lookout for the shooters. We note that the State prosecuted the colleague of the shooter, not the colleagues of the dead rival gang member who indirectly encouraged the murder by engaging in gang activity toward Sandoval's gang.

The State relies on *State v. Parker*, 60 Wn. App. 719, 806 P.2d 1241 (1991). On the night of September 2, 1988, Robert Parker and his fiancé, Cherie Marie Keese, drove respective cars on Interstate 405 near Bellevue. Keese followed Parker twenty to twenty-five car lengths behind. She flashed her lights several times to get his attention and sped to catch him. Parker knew that Keese wished to pull even. Parker told his passenger that Keese would need to follow them to Bellevue because he did not intend to stop. Keese increased her speed to drive tandem with Parker. Parker responded by accelerating further in order to elude her. The two cars traveled in excess of 100 miles per hour.

Parker's passenger asked him to slow. Keese's passenger uttered the same request to Keese. Eyewitnesses considered the two cars racing. As the two cars approached a third car in the interstate's center lane, Keese changed lanes and lost control of her car. Her car careened through the highway's median and struck an oncoming vehicle. The collision killed Keese's passenger and the driver of the oncoming car suffered permanent and serious head injury. Parker's car stopped without incident. The State prosecuted Parker as an accomplice on the theory he encouraged Keese's reckless driving. The jury found him guilty.

This court, in *State v. Parker*, 60 Wn. App. 719 (1991), considered Robert Parker to have engaged in a venture with Keese and to be an active participant in the venture. The two engaged in a cat and mouse game. Keese testified that she would have slowed if Parker had decreased his speed.

Robert Parker engaged in the unlawful behavior of reckless driving before the fatal accident. Jameison engaged in no unlawful behavior before Williams fired the bullet that killed Eduardo Villagomez. Jameison grabbed a gun that he owned legally. He stood his ground. The law did not compel him to leave the area of the Palomino Club. He fired only after Williams fired. Lashawn Jameison also never worked in tandem with Anthony Williams.

The State emphasizes *Black v. State*, 103 Ohio St. 434, 133 N.E. 795 (1921). In *Black*, Harry Black and Ward Logan, police officers, while on duty, entered a saloon.

23

The two officers drank whiskey and then argued with other patrons about the merits of various firearms. A small target was placed in the rear of the saloon, and the officers and others demonstrated the capabilities of assorted firearms by firing six or seven shots. One of those shots missed the target or penetrated through the target, passed through the rear of the saloon, and fatally wounded David Gerber, who walked in the busy alley at the rear of the saloon. A jury convicted the officers of manslaughter. On appeal, the officers asserted that the evidence did not suffice to convict them because the State failed to present proof that a bullet fired by either killed Gerber. The court affirmed the conviction by holding that all those who had a common purpose to participate in the shooting at the target were equally guilty of the commission of the crime.

Lashawn Jameison lacked a common purpose with Anthony Williams. We know who fired the shot that killed Eduardo Villagomez.

Another Washington decision on point is *City of Auburn v. Hedlund*, 165 Wn.2d 645, 201 P.3d 315 (2009). As previously noted, a person is not an accomplice to a crime if he or she is a victim of that same crime. Teresa Hedlund hosted a party where liquor flowed. Following the party, Hedlund rode with five other passengers squashed into a Ford Escort. Hedlund remarkably videotaped the trip. The driver was intoxicated as a result of the party, and he drove into a concrete pillar. Hedlund was the only survivor of the single car accident. She sustained serious injuries herself. The city of Auburn charged her with being an accomplice to driving under the influence and reckless driving.

The State contended that Hedlund's videotaping encouraged the driver to showboat and drive recklessly. At the close of the City's case in chief, the trial court dismissed the charges because a victim may not be charged as an accomplice under RCW 9A.08.020. The Supreme Court affirmed.

In *Hedlund*, the State of Washington argued before the Washington Supreme Court that Hedlund should not be considered a victim of the driver's crime because Hedlund's acts of encouragement occurred before the collision with the column. The court rejected the argument. The exception for victims does not extend only to those whose complicity coextended at the time of the crime. Although the court deemed Hedlund's conduct to be reprehensible, the court did not wish to limit the definition of the term "victim."

Although Anthony Williams likely wished to strike Kwame Bates, not Lashawn Jameison, with the first bullet, one police report declared that Williams also fired the first shot in Jameison's direction. In that sense, Jameison was a victim of Williams's assaultive behavior.

If we read "encourage" too broad, the ramifications of accomplice liability could be endless. One can analogize Lashawn Jameison's station to the purchaser of a controlled substance. The State could and some states have contended that the purchaser of the substance commits not only the crime of possession of the controlled substance but also the crime of delivery of the substance by reason of accomplice liability. By reason

25

of the buyer wishing to purchase the unlawful drugs, the buyer encouraged the seller to deliver the drugs.

In *Robinson v. State*, 815 S.W.2d 361 (Tex. App. 1991), the State convicted Michael Robinson of delivery of marijuana. The appellate court reversed because the defendant purchased the marijuana from a third party. The State argued that, as purchaser, Robinson solicited, encouraged, directed, or aided the commission of the offense. The court noted that the victim of the crime may not be held as an accomplice even though his conduct in a significant sense assists in the commission of the crime. Since the buyer and the seller enter the transaction from opposite poles, they do not aid and assist one another. Their conduct is the antithesis of one another.

We worry about other ramifications of the State's theory of criminal liability. If one stretches the State's argument, Lashawn Jameison would be responsible for his own murder, if Anthony Williams' bullet struck him.

Let us assume a man nags at his wife. An irritated wife retrieves a gun and shoots at her husband. The bullet misses and wounds the couple's child. Under the State's theory, the husband could incur accomplice liability. The husband's conduct encouraged the wife to fire her gun. One may consider this example extreme, because the husband performed no unlawful act and the wife acted irrationally. Nevertheless, Lashawn Jameison performed no criminal act preceding Anthony Williams' first bullet and Williams acted irrationally.

26

Drive-By Shootings

On appeal, as in the trial court, the parties dispute whether the unit of prosecution for the charge of drive-by shooting constitutes the number of shots fired by the accused or the number of bystanders threatened by the shootings. We address a distinct question.

The controlling statute, RCW 9A.36.045(1), declares:

> A person is guilty of drive-by shooting when he or she recklessly discharges a firearm as defined in RCW 9.41.010 in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge *is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter* or the firearm, or both, to the scene of the discharge.

(Emphasis added.) Key to this appeal is what constitutes the immediate area of the motor vehicle that transported the shooter.

We decline to address how to gauge the unit of prosecution for the offense of drive-by shooting. After the parties filed briefs, this court decided *State v. Vasquez*, 2 Wn. App. 2d 632 (2018), which requires a stated proximity between the shooter and his vehicle for purposes of the prosecution. We directed the parties to address this recent decision.

In *State v. Vasquez*, Anthony Vasquez shot and killed Juan Garcia as Garcia sat in the front passenger side of a GMC Envoy parked at the Airport Grocery in Moses Lake. For minutes prior to the shooting, the Envoy was parked near the Airport Grocery's front entrance. Vasquez then arrived at the scene in a Toyota pickup. The Toyota was parked

on the side of the grocery, next to a fenced utility area, approximately sixty-three feet away from the Envoy. Once the Toyota was parked, Vasquez ran from the pickup and hid behind the utility fence for a minute. Vasquez then rushed around the corner of the grocery, across the front-side of the Envoy, and over to the area of the front passenger window of the Envoy. The front window was partially rolled down, exposing Garcia to Vasquez. Vasquez shot and killed Garcia from point-blank range. Vasquez then retreated to the Toyota and the car sped away.

On appeal, this court agreed with Anthony Vasquez that the State's evidence did not suffice to convict him of a drive-by shooting. RCW 9A.36.045(1) demands that the shooter be in the "immediate area" of the vehicle that transported him. We did not establish a concise measurement for determining the immediate area. Nevertheless, we relied on *State v. Rodgers*, 146 Wn.2d 55, 43 P.3d 1 (2002), when fashioning some language to assist in measuring the immediate area in individual circumstances. The legislature narrowly drew the drive-by shooting definition. *Rodgers* and *Vasquez* employed two dictionary definitions of "immediate." The first defined "immediate" as "existing without intervening space or substance . . . being near at hand: not far apart or distant." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1129 (1986); *State v. Rodgers*, 146 Wn.2d at 62; *State v. Vasquez*, 2 Wn. App. 2d at 636. The second defined "immediate" as "[n]ot separated in respect to place; not separated by the intervention of any intermediate object." BLACK'S LAW DICTIONARY 749 (6th ed. 1990); *State v.*

28

*Rodgers*, 146 Wn.2d at 62; *State v. Vasquez*, 2 Wn. App. 2d at 636.

Based on these dictionary definitions, we wrote, in *State v. Vasquez*, that the immediate area was either inside the vehicle or from within a few feet or yards of the vehicle. The crime of drive-by shooting contemplates a shooter who is either inside a vehicle or within easy or immediate reach of the vehicle. Intervening obstacles disqualify a location from being within the immediate area.

In *State v. Rodgers*, the Supreme Court held two blocks did not fall within the immediate area. In *State v. Vasquez*, we held that a distance of sixty-three feet did not qualify as the immediate area. When Lashawn Jameison fired his responding shots, Jameison likely stood closer than sixty-three feet of the Toyota Camry, the car in which he traveled to the Palomino Club. We still hold that Jameison did not stand within the immediate area. The obstacle of an additional car and a telephone pole stood between Jameison and the Camry. The Camry was not within his immediate reach. Jameison stood more than a few feet or yards from the Camry.

We do not base our decision on the ground that the shooting lacked proximity in time to when Lashawn Jameison arrived in the Toyota Camry, but we note that Jameison had not recently ridden in the car. He had entered a club and partied in the intervening minutes.

The State appealed the dismissal of twelve of the fourteen drive-by shooting charges. We affirm the dismissal of those twelve charges, but lack authority to now

dismiss the remaining two charges because those charges are not before the court. We

remand for further proceedings with regard to the two charges in light of our opinion.

CONCLUSION

We affirm the trial court's dismissal of the murder and manslaughter charges and

twelve of fourteen drive-by shooting charges brought against Lashawn Jameison. We

remand for further proceedings consistent with our opinion.

_____
Fearing, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Siddoway, J.

31