# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 54657-4-II |
| Petitioner, | |
| v. | consolidated with |
| DAVID GUDGELL, | |
| Respondent. | |
| STATE OF WASHINGTON, | No. 54664-7-II |
| Petitioner, | |
| v. | |
| ROBERT GUDGELL, | PUBLISHED OPINION |
| Respondent. | |

VELJACIC, J. — David and Robert Gudgell are captains on charter boats, the *Westwind* and

the *Katie Marie*, and they used Pacific Salmon Charters (PSC) to book their passengers. The

Gudgells were convicted in district court of unlawful recreational fishing in the second degree.

The superior court then reversed the convictions. The State now seeks to overturn the superior

court's order reversing the convictions.

The State argues that the superior court erred when it determined that the search warrant

issued for the search of PSC and five boats was overbroad and inseverable, that no nexus existed

between the records to be seized and the places to be searched, that the failure to give an

accomplice instruction was not reversible error because a "captain's liability" instruction

adequately informed the jury of the law of accomplice liability, and that even if the failure to give the accomplice instruction was error, the error was invited by the Gudgells and it was harmless.

We conclude that probable cause existed to obtain records from PSC relating to the *Westwind* (David Gudgell's boat), but not the *Katie Marie* (Robert Gudgell's boat). We also conclude that the warrant is severable despite its overbreadth. We further conclude that instructional error requires reversal. Accordingly, we affirm the superior court's reversal of the Gudgells' convictions, but remand for a new trial with respect to David Gudgell.

FACTS

I.      INITIAL INVESTIGATION

On May 11, 2017, while on a fishing expedition on the boat the *Westwind*, captained by David Gudgell and owned by PSC, Timothy Barry observed the crew of the *Westwind* engaged in high-grading of halibut, which involves continuing to fish after the daily catch limit is reached, and then throwing the smallest fish overboard at the end of the day to fall under the catch limit. Barry saw David Gudgell and a deckhand encourage the customers to continue fishing after the boat had reached its limit of one halibut per passenger. At the end of the day, the deckhand laid out 19 halibut on the deck, which exceeded the limit of 12 halibut (one for each passenger). The deckhand then threw the seven smallest halibut overboard. Three were clearly dead after having their gills cut, and four appeared to be dead. Barry reported what he had seen to the Department of Fish and Wildlife (WDFW). The investigating WDFW officer, Todd Dielman, obtained written statements from two other people who were on the *Westwind* on May 11, 2017, who confirmed Barry's report.

A month later, on the last day of the halibut season, WDFW arranged to have an undercover officer go on a halibut fishing trip on the boat *Pacific Dream*, captained by Thomas Merriman and Brian Cables and owned by Merriman. The officer booked and purchased a place on the *Pacific Dream* through PSC. The officer observed similar high-grading by the crew occurring on that trip, and the crew confirmed to the WDFW officer that they had engaged in high-grading.

II.    AFFIDAVIT AND SEARCH WARRANT

The State obtained a warrant to search the PSC offices and five boats for "[a]ll passenger manifests contained in either a schedule book or an electronic storage device . . . including passenger contact information" for all chartered halibut trips of the 2017 season. Clerk's Papers (CP) (David Dist. Ct.) at 235.[1] The warrant authorized the search of the *Katie Marie*, owned and captained by Robert Gudgell[2] and the *Westwind*, captained by David Gudgell but owned by PSC, as well as three other boats: the *Pacific Dream*, where high-grading had been observed, the *Sarah Kay*, and the *MarB III*. The warrant asserted that there was probable cause to believe that evidence of unlawful recreational fishing in the second degree and wastage of fish and wildlife could be found in the PSC offices and on the *Katie Marie*, the *Westwind*, the *Pacific Dream*, the *Sarah Kay*, and the *MarB III*.

Dielman's affidavit indicated that prior to being employed as a WDFW officer, he owned and operated his own charter fishing business from 2001 to 2014. Dielman recounted his investigation. He related that he began by talking to Barry and to two other passengers from the May 11 trip on David Gudgell's boat, the *Westwind*. The other passengers corroborated what

---

[1] The affidavit identified a broader category of documents than the warrant ultimately delineated. Specifically, in addition to the logbook, the affidavit named business records pertaining to the 2017 season chartered halibut fishing trips.

[2] The ownership of the *Katie Marie* was not referenced in the affidavit.

Barry had reported: that an over limit of seven halibut was discarded from the boat, and at least three of those fish were already dead. One passenger, Gary Collenborne, related that, "From the nature of the ongoing conversation/banter among the captain, the deckhand, and [two other fishermen, who were "regulars"] during the course of [the trip, it] appeared to me that the two regulars were fully aware of what was going on and took it as a matter of course, something routine." CP (David Dist. Ct.) at 243.

Dielman also included in the affidavit the events of the undercover investigation that occurred on the *Pacific Dream*. When the undercover officer, Warren Becker, arrived at PSC, a woman working took his money, checked his name off in a big logbook, and gave him a receipt invoice to give to the captain. Becker also related that almost immediately before departing, one of the captains "mentioned if people caught 'little chickens' referring to smaller halibut, they would not gaff them but rather keep them swimming around in the storage container, so that people could size up if they happened to catch a larger halibut." CP (David Dist. Ct.) at 245.

Dielman wrote that based on his training and experience, the eyewitness accounts of the passengers from the May 11, 2017 *Westwind* trip, and Becker's observations on the *Pacific Dream*, he "believe[d] possession of an overlimit of halibut and wastage resulting from high-grading to be a standard practice for [PSC]." CP (David Dist. Ct.) at 250. He continued, "To fully understand the scope of these crimes, all of the clients from previous halibut charter trips need to be contacted to see if they witnessed or participated in any of these unlawful practices. I believe that these individuals can only be identified by searching for and seizing the business records that we know exist based on observations by our undercover officer." CP (David Dist. Ct.) at 250.

III.   SEARCH RESULTS

WDFW obtained the following records from the PSC offices: two large schedule books, two stacks of booking slips, used license books, receipts for halibut trips, photo copies of payment logs on halibut days for the boats associated with the Gudgells, the *Westwind* and the *Katie Marie*, but also for the *Pacific Dream* and the *Mar B III*.[3]  With this information, officers contacted and interviewed former passengers of the *Westwind* and the *Katie Marie*.  Based on these interviews, the State charged David Gudgell, captain of the *Westwind*, and Robert Gudgell, captain of the *Katie Marie*, with multiple counts of unlawful recreational fishing in the second degree, for fishing for more than the daily limit of halibut, and for failure to return fish immediately to the water.  The State also charged David Gudgell with one count of waste of fish.

IV.   SUPPRESSION MOTION

Prior to trial, the Gudgells moved to suppress the evidence seized under the search warrant, arguing that the search warrant did not establish probable cause that evidence of a crime would be found at the place to be searched; the search warrant did not establish a nexus between the criminal activity, the item to be seized, and the place to be searched; and the search warrant was overbroad.

The district court denied the motion to suppress, concluding (1) that there was probable cause to issue the warrant based on the Dielman's affidavit "combined with his expertise in the charter fishing business," (2) that a connection existed between the alleged crimes and the records located at PSC which consisted of the names of additional prior customers and crew members who could provide further evidence, and (3) even if the search warrant as written was arguably overbroad, the severability doctrine applied to preserve the relevant evidence seized.  CP (David Dist. Ct.) at 288.

---

[3] No records regarding the *Sarah Kay* were found in the search.

5

V.      TRIAL

Twelve people who had taken halibut fishing trips on David Gudgell's boat during the 2017 season testified. A former deckhand of David Gudgell also testified.

Eleven people who had taken trips on Robert Gudgell's boat during the 2017 halibut season also testified. Dielman testified and after the State rested, both the Gudgells testified.

Both the Gudgells and the State proposed an accomplice liability instruction. The court engaged in extensive discussion with the parties about the accomplice liability instruction. They struggled with how to reconcile the unlawful recreational fishing statute's lack of mental state[4] with the fact that accomplice liability attaches only when the accomplice acts or aids with knowledge of the specific crime.

The State also proposed a captain liability instruction, stating that a captain is strictly liable for actions of others on his or her boat. The court initially rejected the captain liability instruction but accepted the accomplice instruction without the knowledge requirement. Later, after further discussion, the court agreed to allow a modified captain liability instruction as well as the accomplice liability instruction with the knowledge requirement.

However, when finalizing the instructions, the accomplice liability instruction was not included, yet the parties both answered affirmatively when the court asked whether they agreed with the instructions. The record is silent as to whether the omission of the accomplice liability instruction was purposeful or inadvertent.[5]

---

[4] Under RCW 77.15.380(2)(b): "A person is guilty of unlawful recreational fishing in the second degree if the person takes or possesses fish or shellfish and: . . . The action violates any department rule regarding seasons, bag or possession limits but less than two times the bag or possession limit, closed areas, closed times, or any other rule addressing the manner or method of fishing for, taking, or possessing fish or shellfish."

[5] The reports of proceedings omit the reading of instructions to the jury.

During closing argument, the State argued for accomplice liability:

> Accomplice liability—now this is important because [defense counsel] is going to present to you that these—these witnesses can't testify that they saw the captain do this. It could have been the deckhand. Whose hand was that throwing the fish over? We don't know.
>
> Well these men have been charged as accomplices which means that they did have knowledge that would promote or facilitate the crime or they solicited, commanded, encouraged, requested another person to commit the crime or they aided or agreed to aid another person in—in committing the crime.
>
> They're going to point to each one of these days and they're going to say that customer caught too many fish. That deckhand threw those fish over. As I stated before they're going to say we didn't know. Ladies and gentlemen of the jury I'll allow you to weigh the evidence.
>
> I will say that Timothy Barry, Ken Collenborne, Gary Collenborne all testified that they stopped fishing but they were told to keep fishing—catch bigger fish. The captains in—in the room today presented that as rallying the troops.
>
> Did they have knowledge—did they solicit, command, encourage or request—did they aid or agree to aid another person? I would argue that just the fact of having a live well on the boat provides knowledge—provides encouragement and it aids another in committing a crime.

6 Report of Proceedings (RP) at 1072-73.

The defense did not discuss accomplice liability in closing argument.

The jury was instructed as to a captain's liability: "By assuming the role of captain, a person assumes the responsibility of ensuring that no one aboard the fishing vessel commits a crime of a violation of fishing regulations or laws." CP (David Dist. Ct.) at 75 (Instr. 19). The to-convict instructions for both methods of committing unlawful recreational fishing in the second degree state "as [a] principle or accomplice" as to both the Gudgells. CP (David Dist. Ct.) at 79 (Instr. 22).

The court also instructed the jury that the first method of committing unlawful recreational fishing in the second degree is to "[f]ish for, take, or possess more than the daily limit of halibut while aboard a fishing vessel," and the second is to "fail[] to immediately return to the water any halibut snagged, hooked, netted or gilled in excess of the daily limit with the least possible injury

to the fish." CP (David Dist. Ct.) at 64 (Instr. 8), 79 (Instr. 22). The jury found David Gudgell guilty of five counts of unlawful recreational fishing in the second degree for fishing for more than the daily limit of halibut, five counts of unlawful recreational fishing in the second degree for failure to return fish immediately to the water, and one count of waste of fish. WAC 220-314-030(3); WAC 220-305-010(6).

The jury found Robert Gudgell guilty of four counts of unlawful recreational fishing in the second degree for fishing for more than the daily limit of halibut and four counts of unlawful recreational fishing in the second degree for failure to return fish immediately to the water. WAC 220-314- 030(3); WAC 220-305-010(6).

The Gudgells appealed to the superior court, which reversed the convictions. The superior court concluded that the search warrant was overbroad, that material assertions in the search warrant affidavit were based on speculation and unsupported conclusions, and the warrant directed the search of boats and records with no nexus to the events of May 11, 2017. The superior court also determined that the unlawful recreational fishing convictions for fishing for more than the daily limit were lesser included offenses of the convictions for failure to return fish immediately to the water, and the failure to give an accomplice instruction was reversible error.[6]

The State sought discretionary review of the superior court's decision. This court granted review as to the search warrant and the failure to give the accomplice liability instruction but denied review as to the lesser included offenses.

---

[6] The superior court's ruling does not indicate on which basis it found that the warrant was overbroad.

8

ANALYSIS

I.     WARRANT

The State argues that the superior court erred when it determined that the search warrant lacked probable cause. It asserts that there was a nexus between the criminal activity and the records, and there was also a nexus between the records to be seized and the places to be searched. It also asserts that the severability doctrine applies, even if the warrant was overbroad as written. We agree with the State insofar as it argues that probable cause supported a search of the records related to the *Westwind*, but disagree that probable cause supported a search of the records related to the *Katie Marie*. And although the warrant was overbroad as written, we agree with the State that the warrant was severable.

A.     Legal Principles

Although the parties focus on the decision of the superior court, we review a district court decision under RALJ 9.1, performing the same function as the superior court. *State v. Brokman*, 84 Wn. App. 848, 850, 930 P.2d 354 (1997). We review the decision of the district court to determine whether that court has committed any errors of law. *Id*.

The Fourth Amendment to the United States Constitution provides that warrants may be issued upon a showing of "'probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *State v. Scherf*, 192 Wn.2d 350, 363, 429 P.3d 776 (2018) (quoting *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004)). Probable cause exists where the supporting affidavit "sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999).

9

"It is only the probability of criminal activity, not a prima facie showing of it, that governs probable cause. The [issuing court] is entitled to make reasonable inferences from the facts and circumstances set out in the affidavit." *Maddox*, 152 Wn.2d at 505. "The affidavit must be based upon more than mere suspicion or personal belief that evidence of the crime will be found at the place to be searched." *State v. Jackson*, 150 Wn.2d 251, 265, 76 P.3d 217 (2003). The affidavit is evaluated in a commonsense manner, rather than hypertechnically, and any doubts are resolved in favor of the warrant. *State v. Ollivier*, 178 Wn.2d 813, 847, 312 P.3d 1 (2013). An issuing magistrate's determination of probable cause is reviewed for abuse of discretion. *State v. Clark*, 143 Wn.2d 731, 748, 24 P.3d 1006 (2001).[7]

Because we review the district court record de novo, we do not decide the assigned errors as the parties present them. It is not a matter of whether the superior court, sitting in its appellate capacity, erred when it determined the trial court erred. Instead, we determine whether the trial court committed any errors of law. RALJ 9.1; *Brokman*, 84 Wn. App. at 850.

B.     Probable Cause

The Gudgells contend that there was no factual support in the affidavit for Dielman's assertion that high-grading was a standard practice for all boats that booked passengers through PSC. This assertion, the Gudgells argue, is merely a suspicion or belief that is insufficient to support probable cause. The Gudgells appear to concede that there was probable cause to search

---

[7] The Supreme Court appears to have adopted two different standards of review for probable cause determinations. In *Ollivier*, the court stated a de novo standard of review of the issuing magistrate's determination of probable cause. 178 Wn.2d at 848. More recently, in *Scherf*, the court applied a more deferential abuse of discretion standard of review. 192 Wn.2d at 363.

the *Pacific Dream* and the *Westwind*.[8]  The *Katie Marie* is the only other boat besides the *Westwind* that is relevant here because the only defendants facing charges in this consolidated case are Robert Gudgell and David Gudgell, the captains of the *Katie Marie* and the *Westwind*, respectively.

In the supporting affidavit, Dielman asserts that he believes—and the investigation shows—that possession of an over limit of halibut and wastage resulting from high-grading is standard practice for PSC "[b]ased on the eyewitness accounts of the passengers from May 11, 2017 trip and our undercover officer's observations" and his "training and experience." CP (David Superior Ct.) at 443.

As for facts and circumstances, the affidavit enumerates that on specific days, the crews of the *Pacific Dream* and the *Westwind* engaged in high-grading.  Both of the boats booked their passengers through PSC, and PSC owns the *Westwind*, but the affidavit gives no information regarding the other three charter boats aside from the names of those boats.  Accordingly, there is no information in the affidavit regarding the ownership of the *Katie Marie*.  Further, the affidavit presents no facts or circumstances that support an inference that any of the other boats, besides the *Westwind* and the *Pacific Dream*, had crews engaged in high-grading, or that PSC directed them to do so.[9]  Rather, the only connection between the conduct on the *Westwind* and the *Pacific Dream* and the other boats (including the *Katie Marie*), is the fact that all boats are chartered out by PSC, and that all boats have their catch cleaned through PSC.  Moreover, PSC owns only the *Westwind*

---

[8] The Gudgells state, "The Superior Court judge properly found that the warrant affidavit did not set forth probable cause to believe 'evidence of a crime' would be found in the offices of Pacific Salmon Charters, or on fishing vessels other than the *Pacific Dream* and *Westwind*." Br. of Resp't at 2.

[9] The affidavit states that the PSC building is owned by Milton Gudgell.  Although he may be related to the defendants, there is nothing in the affidavit indicating what that relationship is, so no inference can be drawn from the mere fact that this person shares the same last name of the defendants.

(captained by David Gudgell). As is clear, the eyewitness accounts and undercover investigation related only to the *Westwind* and the *Pacific Dream*.

Although Dielman has experience with the business of charter fishing, he does not explain how that experience informed his conclusion that the three other boats must also have engaged in high-grading. While an officer may draw reasonable inferences based on training and experience to support probable cause, an officer's belief must be based in fact and not generalizations. *See e.g. Thein*, 138 Wn.2d at 147-48 ("probable cause [must] be based on more than conclusory predictions. Blanket inferences [may not] substitute generalities for the required showing of reasonably specific 'underlying circumstances' that establish evidence of illegal activity."). The facts and inferences do not support an inference that information regarding high-grading will be found any place *other than* the *Westwind*, the *Pacific Dream*, and the PSC offices that have records relating to those two boats.

### 1. Evidence of a Crime

The parties disagree on whether the passenger lists are evidence of a crime. The passenger lists located at PSC are evidence because the crimes at issue are dependent on the number of people on the boat. The lists are therefore evidence of the daily catch limit.

In regard to the *Westwind* and the *Pacific Dream*, both boats were observed participating in high-grading. The obvious purpose of high-grading is to ensure customers go home with the largest fish. It is a reasonable inference that this is the goal on all halibut trips on those two boats, and it is similarly reasonable to infer that it is a standard practice on those two boats. Furthermore, one passenger on the *Westwind* told Dielman that, "From the nature of the ongoing conversation/banter among the captain, the deckhand, and [the two "regulars"] during the course of [the trip,] it appeared to me that the two regulars were fully aware of what was going on and

took it as a matter of course, something routine." CP (David Superior Ct.) at 436-37. This eyewitness account supports the inference that high-grading had occurred on many, if not all, other fishing trips on the *Westwind*, making the number of people on each trip evidence of the crime; the records of who was on each trip were therefore evidence as well.

However, in regard to Robert Gudgell's boat, the *Katie Marie*, there are no facts or circumstances—apart from the officer's belief that high-grading is a common practice on all boats associated with PSC—to support an inference that the records are evidence of a crime. This bare belief is simply not enough. Given the information in the affidavit, at best, the passenger lists would *lead to* evidence of a crime. But they are not themselves evidence of a crime. Recently in *Scherf*, our Supreme Court approved of a trial court's conclusion that, "The phrase 'evidence of a crime' is recognized as broader than evidence proving a crime was committed. It also includes evidence relating to, connected with, or concerning a crime." 192 Wn.2d at 364. Still, there are insufficient facts to establish a reasonable inference that Robert Gudgell, as captain of the *Katie Marie*, was probably engaged in criminal activity.

        2.       Nexus

"[P]robable cause requires a nexus between the criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched." *Scherf*, 192 Wn.2d at 363. "'Absent a sufficient basis in fact from which to conclude evidence of illegal activity will likely be found at the place to be searched, a reasonable nexus [between the items to be seized and the place to be searched] is not established as a matter of law.'" *Jackson*, 150 Wn.2d at 267 (quoting *Thein*, 138 Wn.2d at 147).

The Gudgells argue that there is no nexus between the allegations of high-grading and PSC's records and the records aboard the three other boats (besides the *Westwind* and the *Pacific*

*Dream*), in other words that there is no nexus between the crime and the place to be searched. We agree with the Gudgells to the extent they argue that there is no nexus between the crime and the records seized related the *Katie Marie* (i.e. the items to be seized).[10] As discussed above, the affidavit did not set forth a basis in fact to conclude that the other three boats (beside the *Westwind* and the *Pacific Dream*) were engaged in illegal activity (high-grading), and thus the records from those boats, whether contained at the PSC offices or on the boats themselves are not evidence of criminal activity. Accordingly, no nexus exists between the crime and the items to be seized.

However, the facts and circumstances presented in the affidavit show the necessary nexus between the *Westwind*, the *Pacific Dream*, and PSC's records related to those two boats. As explained above, there is a nexus between the records to be seized and the criminal activity. There is also a nexus between the records for those two boats and the PSC offices (i.e. the place to be searched). But we note again that the affidavit contained no information regarding the *Katie Marie*. Therefore, no nexus exists between the crime alleged and the records relating to that boat at the PSC offices (i.e. no nexus between the criminal activity, the items to be seized, and the place to be searched).

In sum, probable cause supported the search and seizure of records of the *Westwind* and the *Pacific Dream* whether located on those boats or at PSC, but probable cause did not support seizure of any records relating to the *Katie Marie*, nor did it support a search of the *Katie Marie*. The interviews of the *Katie Marie* passengers that supported the charges against Robert Gudgell were obtained because of the records related to the *Katie Marie* that were improperly seized from

---

[10] The *Katie Marie* is the only other boat beside the *Westwind* that is relevant here because the only defendants facing charges in this consolidated case are Robert Gudgell and David Gudgell, the captains of the *Katie Marie* and the *Westwind*, respectively.

14

PSC. Accordingly, we affirm the superior court's ruling that the evidence that related to Robert Gudgell's boat, the *Katie Marie*, should have been suppressed.

C.      Overbreadth and Severability

The Gudgells contend that the warrant was overbroad because it named items for which there was no probable cause to search and that the warrant could not be meaningfully severed.[11] The State disagrees and argues that that the severability doctrine applies even if the warrant was overbroad as written.[12] We agree with the State.

A warrant can be overbroad either because it fails to describe with particularity items for which probable cause exists, or because it describes, particularly or otherwise, items for which probable cause does not exist. *Maddox*, 116 Wn. App. at 805. Regardless of which reason is claimed, the warrant must be read in a commonsense, practical manner, rather than in a hypertechnical sense keeping in mind the circumstances of the case. *Id*. Evidence seized pursuant to a search warrant must be suppressed if probable cause does not support the warrant. *See State v. Betancourth*, 190 Wn.2d 357, 364, 413 P.3d 566 (2018).

Even if a search warrant is overbroad or insufficiently particular, under the severability doctrine, "'infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant but does not require suppression of anything seized pursuant to valid parts

---

[11] We note that this issue is only relevant as to David Gudgell because, as discussed above, the records related to Robert Gudgell's boat, the *Katie Marie*, were seized without probable cause.

[12] The State's briefing fails to address the factors set out in *Maddox* for determining severability for either type of overbreadth. RAP 10.3(a)(6) provides that the appellant's argument should be supported with citation to legal authority and to the record, but this rule is not always strictly applied. *See State v. Olson*, 126 Wn.2d 315, 321-23, 893 P.2d 629 (1995). But under RAP 1.2(c), we may waive any of the RAPs "to serve the ends of justice." *State v. Towessnute*, 197 Wn.2d 574, 578, 486 P.3d 111 (2021). Accordingly, we exercise our discretion to determine the issue on the merits to serve the ends of justice because the elements for severability under *Maddox* are met.

of the warrant.'" *State v. Friedrich*, 4 Wn. App. 2d 945, 963, 425 P.3d 518 (2018) (internal quotation marks omitted) (quoting *State v. Perrone*, 119 Wn.2d 538, 556, 834 P.2d 611(1992)). The doctrine applies when a warrant includes both items that are supported by probable cause and described with particularity and items that are not, as long as a "'meaningful separation' can be made on 'some logical and reasonable basis.'" *Maddox*, 116 Wn. App. at 806-07 (quoting *Perrone*, 119 Wn.2d at 560).

For severability to apply, five requirements must be met: (1) the warrant must lawfully have authorized entry into the premises; (2) the warrant must include one or more particularly described items for which there is probable cause; (3) the part of the warrant that includes particularly described items supported by probable cause must be significant compared to the warrant as a whole; (4) the searching officers must have found and seized the disputed items while executing the valid part of the warrant; and (5) the officers must not have conducted a general search in flagrant disregard of the warrant's scope. *Maddox*, 116 Wn. App. at 807-09.

Here, the five *Maddox* requirements are met. First, the warrant lawfully authorized entry onto the premises; it was valid to the extent that it authorized the search for records relating to the *Westwind* and the *Pacific Dream*. Second, there was probable cause for the seizure of the *Westwind* and the *Pacific Dream* passenger manifests, in whatever form they came in, as discussed above. Third, the part of the warrant authorizing seizure of the records of the two vessels is significant when compared to the warrant as a whole. The purpose of the third factor is to ensure that the warrant is not "'general' in the sense of authorizing 'a general, exploratory rummaging in a person's belongings.'" *Maddox*, 116 Wn. App. at 807-08 (quoting *Andresen v. Maryland*, 427 U.S. 463, 479, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976)). This factor is satisfied because the warrant clearly does not authorize a general exploratory rummaging of PSC's belongings. Instead, it

authorized a search for the records in desks, file cabinets, drawers, and boxes. The fourth factor is also satisfied because the officers seized the records for the *Westwind* and the *Pacific Dream* under the valid part of the warrant allowing for that seizure.[13] And fifth, there is no evidence that the officers disregarded the scope of the warrant, flagrantly or otherwise.

We conclude that the warrant was severable because a meaningful separation on a logical and reasonable basis can be made between the records of the *Westwind* and the records of the other three vessels. Therefore, the warrant was valid against David Gudgell, but not Robert Gudgell because probable cause did not support a search of records related to the *Katie Marie*, as discussed above. Accordingly, the Gudgells' argument concerning overbreadth and severability fails.

II.     ACCOMPLICE INSTRUCTION

The State argues that the superior court erred when it determined that the failure to give an accomplice instruction was reversible error. It contends that the instructions were sufficient to allow each party to argue their theory of the case because "a sufficient instruction concerning accomplice liability in the context of a captain's liability for RCW 77.15 strict liability offenses was given." Br. of Appellant at 10-11. The State also argues that even if the failure to give the accomplice instruction was error, the error was invited by the Gudgells "when his counsel argued against giving an appropriate accomplice instruction" and it was harmless because there was substantial evidence to support conviction as a principle. Br. of Appellant at 11.

The Gudgells argue that the superior court did not err in determining that the failure to give an accomplice liability instruction was reversible error because "[i]t is prosecutorial misconduct

---

[13] The warrant allows the seizure from the *Westwind*, the *Pacific Dream*, and PSC of "[a]ll passenger manifests contained in either a schedule book or an electronic storage device . . . including passenger contact information" for all chartered halibut trips of the 2017 season. CP (David Dist. Ct.) at 235.

which requires reversal to argue [accomplice liability] without an instruction from the court." Br. of Resp't at 16. The Gudgells also argue that the error was not harmless, and the captain's liability instruction has no basis in law and is not sufficient to replace an accomplice liability instruction.[14]

We note that the framing of the issue as instructional error was argued by the State, and the grant of discretionary review treats it as an instructional error rather than prosecutorial misconduct. But, before the superior court, the Gudgells argued that the prosecutor committed misconduct by arguing accomplice liability when an instruction on that theory was not given.

However, we decline to address whether the prosecutor committed misconduct, because any error in not giving an accomplice liability instruction is superseded by the error of giving the captain's liability instruction, which misinformed the jury as to the Gudgells' liability as captains.[15] The instruction has no basis in law. We exercise our discretion to affirm on any grounds supported by the record. *State v. Jameison*, 4 Wn. App. 2d 184, 203, 421 P.3d 463 (2018).

The jury was instructed: "By assuming the role of captain, a person assumes the responsibility of ensuring that no one aboard the fishing vessel commits a crime of a violation of fishing regulations or laws." CP (David Dist. Ct.) at 75 (Instr. 19).

The captain's liability instruction is not an adequate substitute for the missing accomplice liability instruction. Our Supreme Court has made it clear that accomplice liability attaches only when the accomplice acts or aids *with knowledge of the specific crime* that is eventually charged. *State v. Carter*, 154 Wn.2d 71, 78, 109 P.3d 823 (2005). The captain's liability instruction contains

---

[14] We note that this issue is only relevant as to David Gudgell, because the records related to Robert Gudgell's boat, the *Katie Marie*, were seized without probable cause.

[15] *See State v. Davenport*, 100 Wn.2d 757, 675 P.2d 1213 (1984) (reversing after holding that prosecutor committed misconduct by arguing for accomplice liability in closing when the court did not instruct the jury on that theory).

no such requirement, either expressly or impliedly. And the State fails to explain how being "responsible for" another's violations relates to the captain's required knowledge of the crime or his encouragement, solicitation, or aid in committing the charged crime.

Before the superior court, the State argued that the instruction was a correct statement of the law because unlawful recreational fishing is a strict liability crime. The State's briefing before us contains no argument as to the legal basis for giving the captain's liability instruction. The State was unable to provide us with any such legal authority at oral argument either. Instead, when asked from whence this principle of strict liability for captains emanated, the prosecutor responded that it was an ancient principle. Even if unlawful recreational fishing in the second degree is a strict liability crime, it does not follow that the captain of a boat is strictly liable for crimes or violations committed by another person on his or her boat. Nor does stating that a captain is "responsible for ensuring" that no one commits a violation indicate that a failure to so ensure results in criminal liability on the part of the captain for that violation. Ancient or not, this notion of criminal "captain's liability" simply does not exist in Washington.[16] If the State or the district court wants this to be the case, their remedy can be found in legislative enactment, not by creating a new crime from whole cloth. Accordingly, we affirm the superior court, but remand for a new trial.

CONCLUSION

We conclude that probable cause supported a search of records for the *Westwind*, but not for records related to the *Katie Marie* or the *Katie Marie* itself. We also conclude that, although the warrant was overbroad as written, the warrant was severable. Accordingly, we affirm the

---

[16] There is a long list of ancient principles that are not violations of Washington's criminal statutes. We will spare the reader.

superior court's decision reversing Robert Gudgell's conviction, which dismissed his charge for unlawful recreational fishing in the second degree.

We further conclude that the superior court did not err in reversing David Gudgell's conviction for unlawful recreational fishing in the second degree based on instructional error. Accordingly, we affirm the superior court's reversal of the David Gudgells' conviction, but remand for a new trial.

Veljacic, J.

We concur:

Glasgow, A.C.J.

Cruser, J.