# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON | No. 56498-0-II |
| Respondent, | |
| v. | |
| TIMOTHY MICHAEL FOLEY, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, C.J.—KR told police that her ex-fiancé, Timothy Michael Foley, was harassing her by phone and social media, and police obtained a warrant to search Foley's cell phone for certain evidence. When executing the search warrant, two officers saw material that appeared to be depictions of minors engaged in sexually explicit conduct.[1] Police obtained a second search warrant and seized evidence that Foley possessed such depictions.

The State charged Foley with multiple counts of possession of depictions of minors engaged in sexually explicit conduct. At trial, Foley unsuccessfully moved to suppress the evidence recovered from his cell phone.

A jury found Foley guilty of seven counts of first degree possession of depictions of minors engaged in sexually explicit conduct and four counts of second degree possession of such depictions. When the trial court sentenced Foley, it dismissed without prejudice three counts of

---

[1] We recognize that many organizations advocating for survivors of sexual abuse use the term "child sexual abuse material." We use the term "minors engaged in sexually explicit conduct" to mirror the language in RCW 9.68A.070, the statute that criminalizes possessing such depictions.

second degree possession of depictions of minors engaged in sexually explicit conduct to prevent double jeopardy violations. The court imposed a total of 102 months of confinement.

Foley argues that the trial court improperly denied his suppression motion. He also contends that one conviction violated double jeopardy because the court entered eight convictions when Foley committed seven units of prosecution. He assigns error to the trial court's entry of several community custody conditions.

We affirm the trial court's denial of Foley's suppression motion and hold that no double jeopardy violation occurred. We also hold that the community custody conditions prohibiting Foley from accessing sexually exploitative materials and information pertaining to minors are unconstitutionally vague or overbroad. We remand for the trial court to revise or strike them, direct the trial court to strike the condition requiring breath tests and the imposition of community supervision fees, and otherwise affirm the judgment and sentence.

FACTS

I. BACKGROUND

On May 20, 2019, KR called the police. She told an officer that Foley, her ex-fiancé, had been harassing her by phone and social media. She had received an e-mail from Foley dated May 19, 2019. In the e-mail, Foley wrote, "I'm sorry you chose for it to be this way[.] Maybe none of this material will impact custody, employment, Watson Furniture or social standing." Clerk's Papers (CP) at 22. KR had a young son and KR's boyfriend, KJ, worked at Watson Furniture when she received the e-mail.

KR said that the day after Foley sent the e-mail, she got a phone call from SW, her son's father. SW informed her about a "strange" Facebook message from an anonymous user. CP at 21.

The message said SW "might want to search the name [KR] on [Xvideos.com] and similar sites." *Id.* Foley later admitted to sending the Facebook message.

KR told the officer that she searched her name on Xvideos.com and found a pornographic video of herself and her current boyfriend, KJ. When KR and Foley were in a relationship, Foley "enjoyed watching videos of her having sexual encounters with other people." *Id.* KR said the video on Xvideos.com was taken on her phone more than a year ago and that only Foley and KJ "would have had access to it with her permission." CP at 21-22. She did not give anyone permission to post the video and she was confident Foley had posted it.

Later that day, KR contacted the officer again. She said that when she typed her name into Xvideos.com, she found a profile—created that day—with sexually explicit pictures of herself, recordings of herself engaging in sexual acts, and private information about her, including her relationship with KJ. She also saw pictures taken from her Facebook profile. KR said Foley appeared to be actively uploading pictures to the Xvideos.com profile.

In May 2019, with SW's approval, law enforcement got a search warrant for SW's Facebook account. They found the conversation with the anonymous user who pointed SW to Xvideos.com. After identifying the anonymous user's Facebook account, law enforcement obtained a search warrant for the account the following month. Facebook responded that same month with records for the account, which showed that it was created using an email address referencing KR's name and birth date and a phone number similar to the one law enforcement had on file for Foley. Using these records, law enforcement also determined that the person who sent the anonymous message to SW did so from a location close to Foley's apartment.

## II. SEARCH WARRANTS INVOLVING FOLEY'S CELL PHONE

A.      First Search Warrant

On December 26, 2019, a superior court judge issued a warrant to seize the cell phone associated with Foley's number. The warrant authorized a search of the cell phone for evidence of cyberstalking and disclosing intimate images. The warrant authorized officers to search and seize the following:

1. Cellular telephone assigned phone number [ending in 4877];
2. A forensic search of the cellular phone referenced above for: internet history, Facebook, and Facebook Messenger account activity associated with [the email address with KR's name and birth date] between 5/18/2019 04:54:48 UTC and 5/20/2019 05:21:19 UTC, *videos and images of [KR and/or KJ], images and any data related to [Xvideos.com] profile [KR]*, internet history regarding Xvideos.com, any data indicating dominion and control of the cellular phone, all related to RCW 9.61.260 Cyberstalking & RCW 9A.86.010 Disclosing intimate images;
3. Authorize examination of any application being used for location sharing, and/or geofencing used to notify when arriving or leaving a location;
4. Authorize technical assistance by agents and/or employees of any outside experts deemed necessary to assist in obtaining the above described information.

CP at 17 (emphasis added).

The next day, Detectives Gerald Swayze and Chad Birkenfeld went to Foley's home and asked to speak with him. The officers spoke with Foley in an unmarked police car. Swayze asked if the phone number ending in 4877 was Foley's phone number and Foley said it was. Swayze then said he had a search warrant for Foley's cell phone. Foley gave Swayze the cell phone and said he had no password. Birkenfeld asked Foley "if there was anything on the phone that shouldn't be on there," including depictions of minors engaged in sexually explicit conduct. CP at 92. Foley said he did not think so.

Once they finished speaking with Foley, Swayze and Birkenfeld drove away. While Birkenfeld was in the front passenger seat, he asked Swayze what the warrant encompassed and what items needed to be searched. Swayze told him to search for photos and videos of KR, describing KR's appearance. Birkenfeld began a search of the cell phone that lasted roughly five minutes. At that point, Birkenfeld had not read the warrant himself. In a file titled "downloads," Birkenfeld saw a sexually explicit image of a girl who appeared to be between the ages of 8 and 10. *Id.* Birkenfeld immediately stopped his review of images on the phone.

After Swayze and Birkenfeld returned to the sheriff's office, Swayze searched Foley's cell phone. Swayze was in his office alone when he did so. In an interview with defense counsel, Swayze described the search:

> When you go through a phone . . . and you're looking at images, there are thumbnails . . . and I was looking for images of [KR and KJ], and I didn't see any of them, but I made it a point to not click on any of the thumbnails that I suspected to be [depictions of minors engaged in sexually explicit conduct] because I planned on getting an additional warrant for that.

CP at 154-55. Swayze estimated that the search lasted less than an hour.

B. <u>Second Search Warrant and Charges for Possessing Depictions of Minors Engaged in Sexually Explicit Conduct</u>

In January 2020, a superior court judge issued a second warrant to search and seize from Foley's cell phone any depictions of minors engaged in sexually explicit conduct. The warrant authorized officers to search for and seize the following:

1. A forensic search of the cellular phone referenced above for: depictions of minors engaged in sexually explicit conduct as defined in RCW 9.68A.070;
2. Any data indicating dominion and control of the cellular phone;
3. Authorize technical assistance by agents and/or employees of any outside experts deemed necessary to assist in obtaining the above described information.

5

CP at 85. Pursuant to this second warrant, the officers found multiple images that formed the basis of Foley's prosecution.

In a fourth amended information, Foley was eventually charged with eight counts of first degree possession of depictions of minors engaged in sexually explicit conduct and six counts of second degree possession of such depictions.

### III. PRETRIAL MOTIONS

A.      Suppression Motion

Prior to trial, Foley moved "to suppress the Samsung cell phone seized on December 27, 2019 and all of [its] contents." CP at 1. He argued that the first warrant failed to provide probable cause for the seizure of the phone because it did not reliably connect Foley to the phone number and address listed. While he conceded that the first search warrant was "very particular and narrow in its breadth," he argued that Swayze and Birkenfeld "employed no procedural safeguards designed to limit the scope of the search" and reviewed the cell phone "without limitation." CP at 13-14. He further argued that Birkenfeld's search in the car was "clearly a pretext" for finding depictions of minors engaged in sexually explicit conduct. CP at 14. He contended that the officers should have employed "outside experts" and instructed them "to ignore all data not enumerated in the warrant." *Id.*

When Foley indicated that he might want to bring in witnesses, the State responded that "to get outside of the corners of that second warrant . . . [Foley] would have to raise a *Franks* issue and brief that." Verbatim Rep. of Proc. (VRP) (Aug. 3, 2020) at 8. *Franks v. Delaware* holds that a defendant is entitled to a hearing where they make "a substantial preliminary showing" that an affiant knowingly and intentionally, or with reckless disregard for the truth, included a false

statement in a warrant affidavit and the statement is necessary for a finding of probable cause. 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978).

The trial court explained that Foley would need a *Franks* hearing "to talk about what happened prior to the issuance of that second warrant . . . to determine if it's a valid warrant or not." VRP (Aug. 21, 2020) at 18. If Foley could make an offer of proof that created "a reasonable argument . . . that the initial search . . . was improper," the court would give him a *Franks* hearing and take testimony. *Id.* Foley asked to interview Swayze and Birkenfeld. The trial court granted this request and indicated that it would issue an interim order and refrain from addressing the *Franks* issue until Foley's counsel interviewed the detectives.

The trial court then entered findings of fact and conclusions of law otherwise denying Foley's suppression motion. The findings were consistent with the description of the facts related to the search warrants provided above. The findings explained that in a months-long investigation, detectives were able to determine that the Facebook message used to alert SW to KR's images on the pornographic website originated from a cell phone at or near Foley's address. The trial court also found that the downloads folder on Foley's phone was within the scope of the search authorized by the first warrant. The trial court found that all of the evidence seized from the phone was seized pursuant to judicial authorization provided in one of the warrants.

The trial court held that Foley "failed to meet his burden" of showing that the first warrant lacked probable cause or sufficient particularity. CP at 166-67. It further held that the officers executing the first warrant did not exceed the warrant's scope. Regarding the second warrant, the trial court noted that the "issuing magistrate was made aware of the [detectives'] actions before authorizing the [second warrant] and had the ability to inquire as he deemed appropriate." CP at

7

169. The trial court held that the second warrant was facially valid and that Foley failed to establish that the trial court lacked probable cause to issue it.

B.      Motion for a *Franks* Hearing

Foley then filed a supplemental memorandum in support of suppression and a motion for a *Franks* hearing. He argued that "the second search warrant intentionally or recklessly omitted material facts that undercut . . . probable cause." CP at 121. Based on interviews with Birkenfeld and Swayze, he alleged that the following material facts were left out:

> Detective Birkenfeld had never read the first search warrant. He was not guided by any date or time parameters during the cursory search. He was not told that the warrant concerned internet history with [Xvideos.com]. He was not looking for the name '[KR,]' although he was looking for photographs that matched her description. Upon arriving at the sheriff's office, Detective Swayze took over the search. He looked through the phone for "at least an hour" while alone in his office. During that search, he continued to find suspected [depictions of minors engaged in sexually explicit conduct].

*Id.* (citation omitted).

Foley also continued to challenge the first warrant's validity. Stating that he and the State interpreted the warrant differently, he argued that either the warrant was sufficiently particular and Birkenfeld's search exceeded its scope or the warrant authorized the search of Foley's entire Internet history and it was overbroad. Finally, Foley argued that the "procurement of the second search warrant [did] not cure the illegal first search." CP at 125.

The trial court ruled that Foley was not entitled to a *Franks* hearing. It stated that a "defendant is only entitled to a *Franks* hearing if" the defendant complains of omissions from an affidavit that "are material to probable cause and there are allegations of deliberate falsehood or omission or of a reckless disregard for the truth." CP at 183. The trial court held that the details of Birkenfeld's search in the car and Swayze's search in his office were not material to probable

cause for the second warrant, so Foley "failed to make an adequate showing of a material omission." *Id.* And it held that even if the alleged omissions were material, Foley had "nonetheless failed to meet his burden on the intentionality prong under *Franks*." CP at 184. Foley brought a motion for reconsideration, which the trial court also denied.

## IV. TRIAL

Birkenfeld and Swayze testified at trial consistent with the facts as described above. On cross-examination, Foley's counsel asked Birkenfeld, if he had been investigating Foley for possession of depictions of minors engaged in sexually explicit conduct from the start, would he have put Foley's phone in airplane mode, secured it, and sent it to a crime lab rather than searching it himself? Birkenfeld answered affirmatively.

Swayze testified that when an investigation for possession of depictions of minors engaged in sexually explicit conduct involves a digital device, it is generally standard practice to refrain from searching the device before getting a mirror image of it. He also testified that when he began searching Foley's phone on his own, he knew the case would likely evolve into such an investigation but he did not get a mirror image of the phone first.

Foley also testified. He said he did not know how the images of minors engaged in sexually explicit conduct got onto his cell phone. He explained that he lived in an apartment with other people and his phone was not password protected.

The jury found Foley guilty of seven counts of first degree possession of depictions of minors engaged in sexually explicit conduct and four counts of second degree possession of such depictions.

## V. Posttrial Motion and Sentencing

Foley moved to dismiss two convictions for first degree possession of depictions of minors engaged in sexually explicit conduct and all convictions for second degree possession of such depictions, alleging violations of double jeopardy. He argued that because he was convicted of first degree possession of such depictions, he could not be simultaneously convicted of second degree possession of such depictions. He contended that the trial court should therefore dismiss his second degree convictions.

In its response, the State conceded that under the double jeopardy clause, Foley could only be convicted of one count of second degree possession of depictions of minors engaged in sexually explicit conduct because "multiple [s]econd [d]egree images possessed at the same time [comprise] a single unit of prosecution." CP at 329. The State asked the trial court to dismiss the other three convictions for second degree possession of such depictions. However, it argued that Foley's motion to dismiss the remaining conviction for second degree possession of such depictions should be denied because first degree possession and second degree possession are separate crimes.

The trial court dismissed without prejudice three convictions for second degree possession of depictions of minors engaged in sexually explicit conduct "for the reasons stated in the [prosecution's] motion to dismiss." CP at 384. It sentenced Foley to a total of 102 months of confinement. The trial court imposed community custody conditions, including refraining from possessing or accessing "sexually exploitative materials" as defined by Foley's treating therapist or community corrections officer; refraining from possessing or accessing "sexually explicit materials, and/or information pertaining to minors via computer (i.e. internet);" submitting to

10

breath tests; and completing a psychosexual evaluation and following through with all treatment recommended by Foley's community corrections officer and/or treatment provider. CP at 411. In an appendix to the judgment and sentence, the trial court clarified the term "sexually explicit materials," prohibiting Foley from accessing "sexually explicit materials that are intended for sexual gratification," listing examples of such materials, and noting that works "of art or of anthropological significance" are not included. CP at 420. The trial court struck a provision that said, "Possess or consume no alcohol." CP at 411.

The trial court also imposed legal financial obligations, including a "[Department of Corrections] monthly supervision assessment." *Id.* During Foley's sentencing hearing, the trial court stated that it was satisfied that it had imposed the lowest amount of legal financial obligations possible. On the same day, the trial court entered an order finding Foley indigent for purposes of appeal.

Foley appeals.

## ANALYSIS

### I. SUPPRESSION OF EVIDENCE

Foley argues that the trial court erred by failing to suppress evidence seized pursuant to the first and second search warrants. We disagree.

When a trial court denies a motion to suppress evidence, we review that court's legal conclusions de novo. *State v. Budd*, 185 Wn.2d 566, 571-72, 374 P.3d 137 (2016); *State v. Winterstein*, 167 Wn.2d 620, 628, 220 P.3d 1226 (2009).

A.      Search Pursuant to the First Warrant

Foley contends that we must suppress images obtained pursuant to the first warrant because the officers' first search of his phone was improper. We disagree. Probable cause supported the portions of the first warrant authorizing the search for the images, and the officers' execution of the warrant did not exceed its scope.

1.      Probable cause

A warrant is supported by probable cause if the affidavit accompanying the warrant "sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can [be] found at the place to be searched." *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). "A warrant can be overbroad either because it fails to describe with particularity items for which probable cause exists or because it describes, particularly or otherwise, items for which probable cause does not exist." *State v. Gudgell*, 20 Wn. App. 2d 162, 180, 499 P.3d 229 (2021). To be sufficiently particular, a warrant must make it possible for the searcher to reasonably identify the things they are authorized to seize. *State v. Besola*, 184 Wn.2d 605, 610, 359 P.3d 799 (2015).

The "search of computers or other electronic storage devices gives rise to heightened particularity concerns." *State v. Keodara*, 191 Wn. App. 305, 314, 364 P.3d 777 (2015). A "cell phone search would typically expose to the government far *more* than the most exhaustive search of a house." *Riley v. California*, 573 U.S. 373, 396, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014). And where the content on a cell phone, like pictures or videos, forms the basis for seizure, that cell phone content is presumptively protected by the First Amendment to the United States Constitution. *See State v. Perrone*, 119 Wn.2d 538, 550, 834 P.2d 611 (1992) ("Books, films, and

the like are *presumptively* protected by the First Amendment where their content is the basis for seizure."). In a warrant for materials presumptively protected by the First Amendment, "the particularity requirement must be 'accorded the most scrupulous exactitude.'" *Besola*, 184 Wn.2d at 611 (internal quotation marks omitted) (quoting *Perrone*, 119 Wn.2d at 548)).

A warrant targeting a cell phone must be "carefully tailored to the justification to search" and it must be "limited to data for which there was probable cause." *State v. McKee*, 3 Wn. App. 2d 11, 29, 413 P.3d 1049 (2018) *rev'd on other grounds involving remedy*, 193 Wn.2d 271, 438 P3d. 528 (2019). For example, a warrant may contain temporal or topical limits on the information officers can search for and seize. *See id.*

In *McKee*, Division One reviewed a warrant allowing officers to seize "[i]mages, video, documents . . . and any other electronic data from" a cell phone. *Id.* at 19. The court held that the warrant violated the particularity requirement because it gave "police the right to search the contents of the cell phone and seize private information with no temporal or other limitation." *Id.* at 29.

Moreover, in *Keodara*, the court held that a warrant "failed to satisfy the Fourth Amendment's particularity requirement" where it authorized an extensive search of a defendant's phone after police suspected him of assault, drug dealing, and unlawful firearm possession. 191 Wn. App. at 317. The court reasoned that "[t]here was no limit on the topics of information for which the police could search," and that the warrant did not "limit the search to information generated close in time to incidents for which the police had probable cause." *Id.* at 316.

Here, there was probable cause to support the provisions of the first warrant allowing a search for Internet history and Facebook account activity during a two-day period. The affidavit

alleged that around May 19, 2019, Foley contacted KR and SW, telling them he posted an explicit recording of KR and KJ on Xvideos.com. When Foley contacted SW, he did so using a Facebook account tied to an email address with KR's email and birth date. These allegations established probable cause to search for "internet history, Facebook, and Facebook Messenger account activity associated with" the email address "between 5/18/2019 04:54:48 UTC and 5/20/2019 05:21:19 UTC." CP at 17. This description is sufficiently particular, providing a temporal limit on activity associated with an email address Foley used in contacting SW.

There was also probable cause to support the provision in the first warrant allowing a search for images of KR and KJ. The affidavit further alleged that Foley created a fake profile of KR on Xvideos.com, which, in addition to the recording of KR and KJ, displayed explicit pictures and recordings of KR and nonexplicit pictures of KR. If officers had found copies of these recordings and images on Foley's phone, those files would have linked Foley to the profile, providing evidence to support a conviction for disclosing intimate images.

In sum, there was probable cause to search for "videos and images of" KR and KJ, "images and any data related to" KR's fake Xvideos.com profile, and Internet "history regarding Xvideos.com." *Id.* And this description is sufficiently particular, allowing only the seizure of information directly related to the alleged crime, disclosure of intimate images.

Foley contends that "the first search warrant did not provide a sufficiently particular description of the phone." Appellant's Opening Br. at 34. But we interpret warrants "in a commonsense, practical manner, rather than in a hypertechnical sense." *Perrone*, 119 Wn.2d at 549. The warrant affidavit included evidence that the Facebook messages and the disclosure of intimate images occurred using a phone associated with a number ending in 4877. There was thus

14

probable cause to search for a "[c]ellular telephone assigned" to that phone number. CP at 17. Moreover, this provision is sufficiently particular. Putting it in context shows that it identifies the phone to be searched, with subsequent provisions putting limits on what data and applications officers could search and seize.

> 2.      <u>Warrant execution</u>

The record supports the trial court's finding that the detectives did not exceed the scope of the first warrant. When Foley gave the detectives his phone, Birkenfeld asked him if there were depictions of minors engaged in sexually explicit conduct on the device, but there is evidence in the record that Swayze and Birkenfeld would ask this question "on a regular basis" when executing search warrants for cell phones. *See* CP at 147 ("We ask that on a regular basis of people when we take their phones pursuant to a warrant . . . ."). While Birkenfeld did not read the warrant before searching Foley's cell phone, he asked Swayze what the warrant encompassed. Swayze told him to search for photos and videos of KR, giving a description of KR's appearance. When defense counsel conducted an interview, Birkenfeld explained that he followed Swayze's instructions. Defense counsel asked whether Birkenfeld was looking for any reference to KR's name when he came across a depiction of a minor engaged in sexually explicit conduct, and Birkenfeld replied:

> Detective Sgt. Chad Birkenfeld:
> I was looking more for images . . . . So looking at the images that pertain to [KR] based off that description is kind of where I was looking.
>
> [Defense Counsel]:
> Okay. Are you looking for any internet history that referenced [Xvideos.com]?
>
> Detective Sgt. Chad Birkenfeld:
> I was not. No.
>
> [Defense Counsel]:
> Okay. Did you get into Facebook at all?

Detective Sgt. Chad Birkenfeld:
No, sir.

[Defense Counsel]:
How long do you think this cursory search lasted?

Detective Sgt. Chad Birkenfeld:
A couple of minutes. Again, I remember seeing the image and being, "Hey, this appears to be [a depiction of a minor engaged in sexually explicit conduct]. I'm done looking at the phone." I let Detective Swayze know, and I think we even discussed about expanding or getting a separate warrant.

[Defense Counsel]:
Okay. So five minutes or less.

Detective Sgt. Chad Birkenfeld:
At the most five minutes.

CP at 134-35. In other words, Birkenfeld searched only for images of KR, which the warrant authorized.

When Swayze later searched the phone, his search also complied with the warrant. Swayze said that he similarly searched for images of KR and KJ and specifically avoided clicking thumbnails that might have depicted minors engaged in sexually explicit conduct because he planned to get an additional warrant.

Foley argues that under article I, section 7 of the Washington Constitution, when a defendant "raises the possibility that the search exceeded the warrant's authority, the burden shifts to the State to show that the warrant was properly executed." Appellant's Opening Br. at 48-49. He assigns error to the fact that after he challenged officers' execution of the first search warrant, the trial court "refused to hold a hearing on the issue, and the State did not present any evidence showing that the warrant was properly executed." *Id.* at 46. He contends that absent "such evidence, the convictions must be reversed, the evidence suppressed, and the case dismissed with

prejudice." *Id.* But Foley cites no cases standing for the proposition that article I, section 7 requires the State to prove that a warrant was properly executed after a defendant challenges a warrant's execution. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996).

In sum, both detectives reviewed images on Foley's phone to look for photos and videos of KR. The first warrant plainly authorized this search. And probable cause supported the portion of the warrant authorizing a search for images of KR and KJ. The detectives did not search for depictions of minors engaged in sexually explicit conduct until they got the second warrant authorizing that search. Foley does not present any evidence to the contrary.

## B.    Severability of Other Portions of the First Warrant

Foley further argues that we must suppress images obtained pursuant to the first warrant because it was overbroad, allowing "officers to rummage through and seize almost any data contained on the phone." Appellant's Opening Br. at 22. We disagree. Even if Foley were correct that some of the portions of the warrant were invalid, an issue we need not decide, police relied on valid portions of the warrant and the other portions were severable. Thus, suppression was not required.

Where "a warrant includes both items that are supported by probable cause and described with particularity and items that are not," we apply the severability doctrine and require suppression only where police seized evidence based on an invalid part of the warrant. *State v. Higgs*, 177 Wn. App. 414, 430, 311 P.3d 1266 (2013). A warrant is severable where there is a meaningful separation between its valid and invalid parts. *State v. Moses*, 22 Wn. App. 2d 550, 562, 512 P.3d 600, *review denied*, 200 Wn.2d 1010 (2022).

"We consider five factors in determining whether a court can sever invalid parts of a warrant." *Id.* The severability doctrine applies if (1) the warrant lawfully "'authorized entry into the premises,'" (2) the warrant included "'one or more particularly described items for which there is probable cause,'" (3) "'the part of the warrant that includes particularly described items supported by probable cause'" is "'significant when compared to the warrant as a whole,'" (4) the searching officers "'found and seized the disputed items while executing the valid part of the warrant,'" and (5) the officers did not conduct "'a general search . . . in which they "flagrantly disregarded" the warrant's scope.'" *Higgs*, 177 Wn. App. at 430-31 (quoting *State v. Maddox*, 116 Wn. App. 796, 807-08, 67 P.3d 1135 (2003) (*Maddox* I), *aff'd*, 152 Wn.2d 499, 98 P.3d 1199 (2004) (*Maddox* II).

Here, the first warrant authorized the search of the cell phone for "internet history, Facebook, and Facebook Messenger account activity associated with" the email address with KR's name and birth date for a two-day period, "videos and images of [KR and/or KJ], images and any data related to [Xvideos.com] profile [KR], internet history regarding Xvideos.com, any data indicating dominion and control of the cellular phone, all related to RCW 9.61.260 Cyberstalking & RCW 9A.86.010 Disclosing intimate images." CP at 17. The warrant also authorized "examination of any application being used for location sharing, and/or geofencing used to notify when arriving or leaving a location." *Id.*

Foley argues the invalid portions of the warrant included the provision allowing a search for any data indicating dominion and control of the cellular phone, and the portion authorizing officers to search "any application being used for location sharing" or "geofencing." *Id.* However,

police did not seize any evidence based on these provisions; they only seized evidence based on the warrant's valid authorization to search for images of KR and KJ.

Applying the severability test, first, the warrant lawfully authorized police to search the cell phone listed because the warrant affidavit included facts sufficient to support the commonsense inference that it belonged to Foley. Second, as explained above, the warrant included several particularly described items supported by probable cause that Foley disclosed intimate images of KR and KJ through a profile he created on Xvideos.com without their consent. Third, the valid portions of the warrant consisting of particularly described items supported by probable cause were significant when compared to the portions Foley argues were invalid. The warrant validly authorized police to search for images of KR and KJ and for certain Internet history and Facebook activity, and these portions constituted the bulk of the relevant search authorizations.

Fourth, Birkenfeld and Swayze saw suspected depictions of minors engaged in sexually explicit conduct while executing the valid part of the warrant. Birkenfeld was searching for images of KR based on Swayze's description of her when he came across an explicit image of a minor. Swayze was also searching for images of KR when he found suspected depictions of minors engaged in sexually explicit conduct. Fifth, as explained above, officers did not conduct a general search, nor did they disregard the warrant's scope.

In sum, we need not determine whether Foley is correct that some of the provisions in the warrant were invalid because police seized evidence from Foley's phone pursuant to plainly valid parts of the first warrant, and the valid parts are severable from any invalid portions. The trial court did not err in declining to grant the suppression motion based on a challenge to its validity.

C.      Validity of the Second Warrant

Foley contends that "the second warrant was tainted by the invalid first warrant." Appellant's Opening Br. at 53. This argument fails.

As discussed above, the first warrant is severable and police lawfully seized evidence based on the valid part of the warrant, so it did not taint the second warrant.

The second warrant affidavit established that the phone listed belonged to Foley based on the first warrant affidavit. The warrant particularly described the items to be searched by indicating that the images had to depict "minors engaged in sexually explicit conduct as defined in RCW 9.68A.070." CP at 85. There was probable cause to believe such depictions would be found on the cell phone because officers had already found images that appeared to show minors engaged in sexually explicit conduct. This valid provision constituted the heart of the warrant. Finally, while the record lacks details on the search following the second warrant, at trial, the State only relied on alleged depictions of minors engaged in sexually explicit conduct and technical information about Foley's cell phone. It did not rely on other content, such as notes, texts, e-mails, or innocuous images Foley had saved.

Because the first warrant did not taint the second warrant and because the second warrant lawfully authorized police to search Foley's phone for images depicting minors engaged in sexually explicit conduct, suppression of the evidence yielded from the second warrant is not required. Foley identifies no other evidence police found and presented at trial as a result of the search of his phone.

There is no basis for us to reverse the trial court's denial of the motion to suppress.

## II. IMPROPERLY RAISED ARGUMENTS FOR SUPPRESSION OF EVIDENCE

### A.    Errors Not Raised Below

Foley makes two arguments for the first time on appeal. First, he contends that the first search warrant was partly based on an unconstitutional statute because a Washington federal court struck down a portion of former RCW 9.61.260 (2004), *recodified as* RCW 9A.90.120, which criminalized cyberstalking. Second, he contends that the first warrant was not supported by probable cause because it was based on stale information. Foley's arguments fail.

We "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). "However, a party may raise" a "manifest error affecting a constitutional right" for the first time on appeal. *Id.* To establish that an error is manifest, an appellant must make a plausible showing that it had practical and identifiable consequences in the trial. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015). An error is manifest if the trial court could have corrected it when it occurred despite the parties' failure to raise the issue. *See id.* We conclude that neither assertion of error warrants review for the first time on appeal.

### 1.    Unconstitutional statute

The first warrant authorized a search of Foley's cell phone for specific types of data related to former RCW 9.61.260, the statute that criminalized cyberstalking, and RCW 9A.86.010, the statute criminalizing the disclosure of intimate images. "In instances where a warrant is facially insufficient or an arrest is based on an unconstitutional statute, a constitutional violation clearly exists because of the demonstrable absence of 'authority of law' to justify the search or arrest." *State v. Chenoweth*, 160 Wn.2d 454, 472-73, 158 P.3d 595 (2007). However, the warrant relied on

both the former cyberstalking statute and the statute criminalizing the disclosure of intimate images.

Here, police properly relied on the portions of the warrant that were based on disclosure of intimate images to execute their search. Their search was limited to a search for images on the phone.

Even assuming the former cyberstalking statute was at least partly unconstitutional, police seized evidence pursuant only to the valid parts of the warrant, so there were no practical and identifiable consequences stemming from the fact that the warrant listed the statute. Therefore, reference to cyberstalking in the warrant was not a manifest error affecting a constitutional right.

### 2. Stale information

The Fourth Amendment to the United States Constitution requires that warrants be issued based on a showing of probable cause. *State v. Maddox*, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004) (*Maddox* II). "In some situations, the evidence relied upon in support of a warrant application may become stale so that probable cause no longer exists." *State v. Garbaccio*, 151 Wn. App. 716, 728, 214 P.3d 168 (2009). One factor to consider in assessing staleness is the time between the gathering of the evidence and the issuing of the warrant, but the passage of time is not controlling. *Id.* Other factors include the nature of the alleged crime, the nature of the person alleged to have committed it, the type of evidence police expected to seize, and the type of place or object police intended to search. *Id.*

For example, in *Garbaccio*, a detective found that a depiction of minors engaged in sexually explicit conduct was available for download from the Internet Protocol address assigned to the defendant's home computer. *Id.* at 721. The detective waited five months to obtain a warrant

22

to search the defendant's home and "seize various computer hardware and software." *Id.* at 722. Division One held that the "issuing judge properly found the existence of probable cause," reasoning that the five-month delay in applying for the warrant was reasonable "in light of the nature of the offense and of the contraband sought to be seized." *Id.* at 730.

Here, the information relied on to obtain the first search warrant was not stale. First, the record indicates that police investigated Foley diligently. The trial court found that police engaged in a months-long investigation after KR contacted them, and there has not been adequate argument to support reversing this finding. Second, while Foley allegedly disclosed an intimate video of KR in May 2019, modern cell phones have significant storage capacity, and it was reasonable for police to determine that Foley likely retained intimate images of KR and KJ on his phone several months later. Thus, the alleged staleness of the evidence supporting the warrant was not a manifest error affecting a constitutional right.

B.      Waiver of Assignments of Error Challenging Findings of Fact

Foley assigns error to the trial court's adoption of several findings of fact. He supports these assignments of error only with conclusory arguments in footnotes.We therefore decline to consider them.

"Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Palmer v. Jensen*, 81 Wn. App. 148, 153, 913 P.2d 413 (1996). And we may decline to address the merits of a claim where a party supports it in a footnote without meaningfully addressing it in the text. *See State v. Johnson*, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993).

Here, Foley challenged the trial court's findings of fact in footnotes but not in the text of his opening brief. His arguments are conclusory and he gave these assignments of error passing

treatment, so we decline to address them and reject his challenges to the trial court's findings of fact.

### III. DOUBLE JEOPARDY

Foley argues that the trial court infringed on his right to be free from double jeopardy. First, he contends that the trial court erred because his convictions on counts 11 through 13 should have been dismissed with prejudice rather than without prejudice. Second, he contends that the trial court improperly "entered eight convictions even though Mr. Foley committed only seven units of prosecution." Appellant's Opening Br. at 57. We disagree.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington Constitution prohibit double jeopardy. *State v. Classen*, 4 Wn. App. 2d 520, 531, 422 P.3d 489 (2018). "The prohibition on double jeopardy disallows a person from being prosecuted for the same offense after being acquitted, being prosecuted for the same offense after being convicted, or receiving multiple punishments for the same offense." *Id.* "We review double jeopardy claims de novo." *Id.*

A.      Dismissal Without Prejudice

Foley argues that the trial court should have vacated his convictions on counts 11 through 13 with prejudice. He cites *State v. Turner* for the proposition that "a court violates double jeopardy by vacating a conviction 'while directing, in some form or another, that the conviction nonetheless remains valid.'" Appellant's Opening Br. at 56 (quoting *Turner*, 169 Wn.2d 448, 464, 238 P.3d 461 (2010)). He then argues that we must remand this case "with instructions to strike the 'Order of Dismissal' entered on September 27, 2021, and substitute an order vacating [ his convictions on

counts 11 through 13], without any reference to the continuing validity of the convictions." *Id.* at 57.

However, *Turner* is distinguishable. *Turner* concerned "conditional vacations . . . in which a judge expressly rules . . . that a conviction that violates double jeopardy is nevertheless 'valid' for purposes of possible reinstatement at sentencing." 169 Wn.2d at 461. In the two cases *Turner* examined, the trial courts "sought to expressly hold the defendants' lesser convictions 'in abeyance' lest their other convictions failed on appeal, declaring in each case that the conviction retained validity.'" *Id.* at 463 (internal quotation marks omitted) (quoting .*State v. Womac*, 160 Wn.2d 643, 659, 160 P.3d 40 (2007)).

Nothing in this record shows that the trial court made a similar declaration in this case. And Foley has not established that dismissal "without prejudice" is the equivalent of an order "directing, in some form or another, that the conviction nonetheless remains valid." *Id.* at 464. Foley's argument fails.

B.    Units of Prosecution

When there are multiple violations of a single statute, we inquire what unit of prosecution the legislature intended under the statute. *State v. Bobic*, 140 Wn.2d 250, 261, 996 P.2d 610 (2000). "'When the [l]egislature defines the scope of a criminal act (the unit of prosecution), double jeopardy protects a defendant from being convicted twice under the same statute for committing just one unit of the crime.'" *Id.* (quoting *State v. Adel*, 136 Wn.2d 629, 634, 965 P.2d 1072 (1998)). We will construe any ambiguity in favor of lenity for the defendant. *Id*. at 261-62.

To commit first degree possession of depictions of minors engaged in sexually explicit conduct, "a person must knowingly possess a visual or printed matter depicting a minor engaged

in sexually explicit conduct as defined by RCW 9.68A.011(4)(a) through (e)."[2] *State v. Polk*, 187 Wn. App. 380, 391, 348 P.3d 1255 (2015). This conduct is sexual intercourse, penetration "of the vagina or rectum by any object," masturbation, sadomasochistic abuse, and defection "or urination for the purpose of sexual stimulation of the viewer." RCW 9.68A.011(4)(a)-(e). "For the purposes of determining the unit of prosecution for [first degree possession], each depiction or image constitutes a separate offense." *Polk*, 187 Wn. App. at 391.

To commit second degree possession of depictions of minors engaged in sexually explicit conduct, a person must knowingly possess "any visual or printed matter depicting a minor engaged in sexually explicit conduct as defined in RCW 9.68A.011(4)(f) or (g)." *Id.* at 392. The depictions are "the genitals or unclothed pubic or rectal areas of any minor, or the unclothed breast of a female minor, for the purpose of sexual stimulation of the viewer" and the touching "of a person's clothed or unclothed genitals, pubic area, buttocks, or breast area for the purpose of sexual stimulation of the viewer." RCW 9.68A.011(4)(f)-(g). "'For the purposes of determining the unit of prosecution under this subsection, each incident of possession of one or more depictions or images of visual or printed matter constitutes a separate offense.'" *Polk*, 187 Wn. App. at 392 (quoting former RCW 9.68A.070(2)(c) (2010)).

Here, Foley committed eight units of prosecution, so he was not punished twice for the same offense in violation of double jeopardy. His seven counts of first degree possession are based on having five separate depictions of sexual intercourse and two separate depictions of penetration. His one count of second degree possession is based on having depictions of unclothed minors that

---

[2] *Polk* interpreted an older version of the statute that criminalized possessing depictions of minors engaged in sexually explicit conduct. However, the subsequent changes to the statute are not material to our analysis.

were distinct from the depictions relied on for the first degree possession convictions. Therefore, the trial court did not err when it entered eight convictions on Foley's judgment and sentence.

## IV. COMMUNITY CUSTODY CONDITIONS

### A.   Vague, Overbroad, and Non-Crime-Related Conditions

Foley argues that the trial court "adopted conditions of community custody that were vague, overbroad, and insufficiently related to the circumstances of [his] crime." Appellant's Opening Br. at 60. Specifically, Foley contends that the requirement that he refrain from possessing or accessing sexually exploitative materials is unconstitutionally vague; that the requirement that he refrain from possessing or accessing sexually explicit materials is overbroad;[3] and that the requirement that he refrain from possessing or accessing information pertaining to minors is unconstitutionally vague, overbroad, and insufficiently crime-related. We hold that, in this context, the terms "sexually exploitative materials" and "information pertaining to minors" are unconstitutionally vague. Foley's argument that the term "sexually explicit materials" is overbroad fails.

We review "community custody conditions for abuse of discretion." *State v. Padilla*, 190 Wn.2d 672, 677, 416 P.3d 712 (2018). "A trial court abuses its discretion if it imposes an unconstitutional condition." *Id.*

### 1.   Sexually exploitative materials

A community custody condition "is unconstitutionally vague if (1) it does not sufficiently define the proscribed conduct so an ordinary person can understand the prohibition or (2) it does

---

[3] Foley initially argued this condition was not crime-related, but he withdrew that argument in his reply. Appellant's Reply Br. at 27, n.9.

not provide sufficiently ascertainable standards to protect against arbitrary enforcement." *Id.* When determining whether a term is vague, we consider statutes and court opinions that define the term. *See State v. Bahl*, 164 Wn.2d 739, 756, 193 P.3d 678 (2008).

A "vague condition infringing on protected First Amendment speech can chill the exercise of those protected freedoms." *Padilla*, 190 Wn.2d at 677-78. "Accordingly, a restriction implicating First Amendment rights demands a greater degree of specificity and must be reasonably necessary to accomplish the essential needs of the state and public order." *Id.* at 678.

For example, in *Bahl*, the court held that a "restriction on accessing or possessing pornographic materials [was] unconstitutionally vague." *Bahl*, 164 Wn.2d at 758. It reasoned that where a statute criminalizing the promotion of pornography referenced a separate statute defining "lewd matter," an ordinary person would not have been able to understand the meaning of "pornography." *Id.* at 756-57. In contrast, in *State v. Nguyen*, the court held that a community custody condition prohibiting the probationer from accessing sexually explicit materials as defined in RCW 9.68.130 was not vague. 191 Wn.2d 671, 680-81, 425 P.3d 847 (2018).

The State concedes that the prohibition on sexually exploitative materials is currently "vague as written." Br. of Resp't at 44. The State suggests that "the crime of sexual exploitation of a minor," as defined in RCW 9.68A.040, "can provide content to such a prohibition." *Id.*

In light of the State's concession, we remand for the trial court to clarify the condition by referencing the crime of sexual exploitation of a minor, as defined in RCW 9.68A.040, as well as the definition of sexually explicit conduct in RCW 9.68A.011(4), a term that is referenced in RCW 9.68A.040.

### 2. Sexually explicit materials

A community custody condition "that encompasses constitutionally protected speech activities within its prohibitions may be overbroad and violate the First Amendment." *See State v. Johnson*, 12 Wn. App. 2d 201, 214, 460 P.3d 1091 (2020), *aff'd*, 197 Wn.2d 740, 487 P.3d 893 (2021). However, a court may restrict a defendant's exercise of their First Amendment rights if the restriction is sensitively imposed and reasonably necessary to accomplish government needs. *Id.*

Here, the community custody condition is sufficiently narrowly drawn. The condition only prohibits possession of "sexually explicit materials that are intended for sexual gratification." CP at 420. The condition then provides a long list of examples. Finally, the condition carves out works of art or works of anthropological significance, which are not considered sexually explicit materials. The Washington Supreme Court has approved a similar condition where the defendant was convicted of child rape and molestation, even though the prohibition was not limited to sexually explicit materials involving children. *Nguyen*, 191 Wn.2d at 675, 686. And the *Nguyen* court concluded a person of ordinary intelligence could determine the difference between sexually explicit materials and works of art or works with anthropological significance. *Id*. at 680-81. The condition imposed here was not unconstitutionally overbroad.

### 3. Information pertaining to minors

A community custody condition is unconstitutionally vague where it has the potential to "encompass a wide range of everyday items" and therefore provides insufficient protection against arbitrary enforcement. *State v. Valencia*, 169 Wn.2d 782, 794, 239 P.3d 1059 (2010). For example,

in *Valencia*, the court held that a community custody condition prohibiting the possession of any paraphernalia that could be used for the ingestion, processing, or sale of drugs was unconstitutionally vague. *Id.* at 785, 794. The court reasoned that "an inventive probation officer could envision any common place item as possible for use as drug paraphernalia, such as sandwich bags or paper." *Id.* at 794 (internal quotation marks omitted).

Here, there is no statutory definition of "information pertaining to minors," and the term encompasses a wide variety of innocuous, everyday information, a problem that the Washington Supreme Court has held could easily lead to arbitrary enforcement. *Id.* It could cover a movie review that mentions a child actor or a news article related to a disease outbreak among children, for example. This community custody condition provides insufficient protection against arbitrary enforcement. We remand for the trial court to clarify this prohibition.

B.      Breath Tests

Foley argues that the trial court exceeded its authority by ordering him to submit to breath tests at his own expense. The State concedes this requirement must be stricken. We agree.

When a trial court sentences a person to a term of community custody, it may order the probationer to "perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community."[4] Former RCW 9.94A.703(3)(d) (2021).

---

[4] We cite to the version of the statute that was in effect at the time of Foley's sentencing. The quoted language is identical to the language in the current version of the statute.

Here, nothing in the record suggests that alcohol played any role in Foley's offenses. In fact, the trial court declined to require that Foley refrain from possessing or consuming alcohol. We therefore accept the State's concession. The trial court must strike this provision on remand.

C.      Compliance with Treatment

Foley argues that the trial court erred in ordering him to comply with all treatment recommended by his community corrections officer. He argues that the "improper delegation to [the Department of Corrections] violated the separation of powers." Appellant's Opening Br. at 72. We disagree.

The Department may require a person under community supervision "to participate in rehabilitative programs, or otherwise perform affirmative conduct."[5] Former RCW 9.94A.704(4) (2019). The Department's "authority to impose conditions of community custody is . . . broader than the sentencing court's authority." *State v. Ortega*, 21 Wn. App. 2d 488, 495, 506 P.3d 1287 (2022). For example, in *Ortega*, the court affirmed a condition requiring a probationer to "comply with any crime-related prohibitions" per the community corrections officer, reasoning that the condition simply communicated the Department's statutory authority to impose conditions of community custody. *Id.* at 492 (internal quotation marks omitted).

Here, the condition Foley challenges is narrower than the condition in *Ortega*. In imposing it, the trial court merely recognized the Department's existing authority to recommend additional treatment. We hold that the trial court did not abuse its discretion.

---

[5] We cite to the version of the statute that was in effect at the time of Foley's sentencing. The quoted language is identical to the language in the current version of the statute.

## V. Clerical Error

Foley contends that the trial court erroneously "left in place a boilerplate provision directing [him] to 'Pay [the Department of Corrections] monthly supervision assessment.'" Appellant's Opening Br. at 73 (quoting CP at 411). He argues that the circumstances of his sentencing show that the trial court meant to strike this provision. The State concedes, stating that the "record supports the trial court's knowledge that Foley was indigent." Br. of Resp't at 51. We accept the State's concession.

Community supervision fees are discretionary legal financial obligations. *State v. Spaulding*, 15 Wn. App. 2d 526, 536, 476 P.3d 205 (2020). Where the record shows that the sentencing court intended to waive all discretionary legal financial obligations, we may find its imposition of such an obligation inadvertent. *See State v. Geyer*, 19 Wn. App. 2d 321, 332, 496 P.3d 322 (2021).

Here, the trial court found Foley indigent and explicitly stated that it intended to impose the lowest amount of legal financial obligations possible. Moreover, the challenged provision was in a dense portion of a printed judgment and sentence form. We therefore remand for the trial court to strike the requirement that Foley pay community supervision fees.

## CONCLUSION

We affirm the trial court's denial of Foley's motion to suppress evidence based on the first and second search warrants. We also find that no double jeopardy violation occurred here.

We hold that the community custody conditions prohibiting Foley from accessing sexually exploitative materials and information pertaining to minors are unconstitutionally vague and remand to the trial court to either strike or clarify these conditions. We direct the trial court to

strike the condition requiring Foley to submit to breath tests at his own expense and the provision requiring Foley to pay community supervision fees. We otherwise affirm the judgment and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Lee, J.

Price, J.